## SCHOOL COMMITTEE OF THE TOWN OF BURLING-TON, MASSACHUSETTS, ET AL. *v.* DEPARTMENT OF EDUCATION OF MASSACHUSETTS ET AL.

No. 84–433.   Argued March 26, 1985—Decided April 29, 1985

Rehnquist, J., delivered the opinion for a unanimous Court.

*David Berman* argued the cause for petitioners. With him on the briefs was *Jane Kenworthy Lewis.*

*Ellen L. Janos,* Assistant Attorney General of Massachusetts, argued the cause for respondent Department of Education of Massachusetts. With her on the brief were *Francis X. Bellotti,* Attorney General, *Judith S. Yogman,* Assistant Attorney General, and *Kristen Reasoner Apgar. David W. Rosenberg* argued the cause and filed a brief for respondent Panico.*

---

*\*Thomas A. Mela* and *Stanley J. Eichner* filed a brief for Developmental Disabilities Law Center et al. as *amici curiae* urging affirmance.

JUSTICE REHNQUIST delivered the opinion of the Court.

The Education of the Handicapped Act (Act), 84 Stat. 175, as amended, 20 U. S. C. § 1401 *et seq.*, requires participating state and local educational agencies "to assure that handicapped children and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education" to such handicapped children. § 1415(a). These procedures include the right of the parents to participate in the development of an "individualized education program" (IEP) for the child and to challenge in administrative and court proceedings a proposed IEP with which they disagree. §§ 1401(19), 1415(b), (d), (e). Where as in the present case review of a contested IEP takes years to run its course—years critical to the child's development—important practical questions arise concerning interim placement of the child and financial responsibility for that placement. This case requires us to address some of those questions.

Michael Panico, the son of respondent Robert Panico, was a first grader in the public school system of petitioner Town of Burlington, Mass., when he began experiencing serious difficulties in school. It later became evident that he had "specific learning disabilities" and thus was "handicapped" within the meaning of the Act, 20 U. S. C. § 1401(1). This entitled him to receive at public expense specially designed instruction to meet his unique needs, as well as related transportation. §§ 1401(16), 1401(17). The negotiations and other proceedings between the Town and the Panicos, thus far spanning more than eight years, are too involved to relate in full detail; the following are the parts relevant to the issues on which we granted certiorari.

In the spring of 1979, Michael attended the third grade of the Memorial School, a public school in Burlington, Mass., under an IEP calling for individual tutoring by a reading specialist for one hour a day and individual and group counselling. Michael's continued poor performance and the fact that

Memorial School was not equipped to handle his needs led to much discussion between his parents and Town school officials about his difficulties and his future schooling. Apparently the course of these discussions did not run smoothly; the upshot was that the Panicos and the Town agreed that Michael was generally of above average to superior intelligence, but had special educational needs calling for a placement in a school other than Memorial. They disagreed over the source and exact nature of Michael's learning difficulties, the Town believing the source to be emotional and the parents believing it to be neurological.

In late June, the Town presented the Panicos with a proposed IEP for Michael for the 1979–1980 academic year. It called for placing Michael in a highly structured class of six children with special academic and social needs, located at another Town public school, the Pine Glen School. On July 3, Michael's father rejected the proposed IEP and sought review under § 1415(b)(2) by respondent Massachusetts Department of Education's Bureau of Special Education Appeals (BSEA). A hearing was initially scheduled for August 8, but was apparently postponed in favor of a mediation session on August 17. The mediation efforts proved unsuccessful.

Meanwhile the Panicos received the results of the latest expert evaluation of Michael by specialists at Massachusetts General Hospital, who opined that Michael's "emotional difficulties are secondary to a rather severe learning disorder characterized by perceptual difficulties" and recommended "a highly specialized setting for children with learning handicaps . . . such as the Carroll School," a state-approved private school for special education located in Lincoln, Mass. App. 26, 31. Believing that the Town's proposed placement of Michael at the Pine Glen School was inappropriate in light of Michael's needs, Mr. Panico enrolled Michael in the Carroll School in mid-August at his own expense, and Michael started there in September.

The BSEA held several hearings during the fall of 1979, and in January 1980 the hearing officer decided that the Town's proposed placement at the Pine Glen School was inappropriate and that the Carroll School was "the least restrictive adequate program within the record" for Michael's educational needs. The hearing officer ordered the Town to pay for Michael's tuition and transportation to the Carroll School for the 1979–1980 school year, including reimbursing the Panicos for their expenditures on these items for the school year to date.

The Town sought judicial review of the State's administrative decision in the United States District Court for the District of Massachusetts pursuant to 20 U. S. C. § 1415(e)(2) and a parallel state statute, naming Mr. Panico and the State Department of Education as defendants. In November 1980, the District Court granted summary judgment against the Town on the state-law claim under a "substantial evidence" standard of review, entering a final judgment on this claim under Federal Rule of Civil Procedure 54(b). The court also set the federal claim for future trial. The Court of Appeals vacated the judgment on the state-law claim, holding that review under the state statute was pre-empted by § 1415(e)(2), which establishes a "preponderance of the evidence" standard of review and which permits the reviewing court to hear additional evidence. 655 F. 2d 428, 431–432 (1981).

In the meantime, the Town had refused to comply with the BSEA order, the District Court had denied a stay of that order, and the Panicos and the State had moved for preliminary injunctive relief. The State also had threatened outside of the judicial proceedings to freeze all of the Town's special education assistance unless it complied with the BSEA order. Apparently in response to this threat, the Town agreed in February 1981 to pay for Michael's Carroll School placement and related transportation for the 1980–1981 term, none of which had yet been paid, and to continue

paying for these expenses until the case was decided. But the Town persisted in refusing to reimburse Mr. Panico for the expenses of the 1979–1980 school year. When the Court of Appeals disposed of the state claim, it also held that under this status quo none of the parties could show irreparable injury and thus none was entitled to a preliminary injunction. The court reasoned that the Town had not shown that Mr. Panico would not be able to repay the tuition and related costs borne by the Town if he ultimately lost on the merits, and Mr. Panico had not shown that he would be irreparably harmed if not reimbursed immediately for past payments which might ultimately be determined to be the Town's responsibility.

On remand, the District Court entered an extensive pretrial order on the Town's federal claim. In denying the Town summary judgment, it ruled that 20 U. S. C. § 1415(e)(3) did not bar reimbursement despite the Town's insistence that the Panicos violated that provision by changing Michael's placement to the Carroll School during the pendency of the administrative proceedings. The court reasoned that § 1415(e)(3) concerned the physical placement of the child and not the right to tuition reimbursement or to procedural review of a contested IEP. The court also dealt with the problem that no IEP had been developed for the 1980–1981 or 1981–1982 school years. It held that its power under § 1415(e)(2) to grant "appropriate" relief upon reviewing the contested IEP for the 1979–1980 school year included the power to grant relief for subsequent school years despite the lack of IEPs for those years. In this connection, however, the court interpreted the statute to place the burden of proof on the Town to upset the BSEA decision that the IEP was inappropriate for 1979–1980 and on the Panicos and the State to show that the relief for subsequent terms was appropriate.

After a 4-day trial, the District Court in August 1982 overturned the BSEA decision, holding that the appropriate 1979–1980 placement for Michael was the one proposed by

the Town in the IEP and that the parents had failed to show that this placement would not also have been appropriate for subsequent years. Accordingly, the court concluded that the Town was "not responsible for the cost of Michael's education at the Carroll School for the academic years 1979–80 through 1981–82."

In contesting the Town's proposed form of judgment embodying the court's conclusion, Mr. Panico argued that, despite finally losing on the merits of the IEP in August 1982, he should be reimbursed for his expenditures in 1979–1980, that the Town should finish paying for the recently completed 1981–1982 term, and that he should not be required to reimburse the Town for its payments to date, apparently because the school terms in question fell within the pendency of the administrative and judicial review contemplated by § 1415(e)(2). The case was transferred to another District Judge and consolidated with two other cases to resolve similar issues concerning the reimbursement for expenditures during the pendency of review proceedings.

In a decision on the consolidated cases, the court rejected Mr. Panico's argument that the Carroll School was the "current educational placement" during the pendency of the review proceedings and thus that under § 1415(e)(3) the Town was obligated to maintain that placement. *Doe* v. *Anrig*, 561 F. Supp. 121 (1983). The court reasoned that the Panicos' unilateral action in placing Michael at the Carroll School without the Town's consent could not "confer thereon the imprimatur of continued placement," *id.*, at 129, n. 5, even though strictly speaking there was no actual placement in effect during the summer of 1979 because all parties agreed Michael was finished with the Memorial School and the Town itself proposed in the IEP to transfer him to a new school in the fall.

The District Court next rejected an argument, apparently grounded at least in part on a state regulation, that the Panicos were entitled to rely on the BSEA decision upholding

their placement contrary to the IEP, regardless of whether that decision were ultimately reversed by a court. With respect to the payments made by the Town after the BSEA decision, under the State's threat to cut off funding, the court criticized the State for resorting to extrajudicial pressure to enforce a decision subject to further review. Because this "was not a case where the town was legally obliged under section 1415(e)(3) to continue payments preserving the status quo," the State's coercion could not be viewed as "the basis for a final decision on liability," and could only be "regarded as other than wrongful . . . on the assumption that the payments were to be returned if the order was ultimately reversed." *Id.*, at 130. The court entered a judgment ordering the Panicos to reimburse the Town for its payments for Michael's Carroll placement and related transportation in 1980–1981 and 1981–1982. The Panicos appealed.

In a broad opinion, most of which we do not review, the Court of Appeals for the First Circuit remanded the case a second time. 736 F. 2d 773 (1984). The court ruled, among other things, that the District Court erred in conducting a full trial *de novo*, that it gave insufficient weight to the BSEA findings, and that in other respects it did not properly evaluate the IEP. The court also considered several questions about the availability of reimbursement for interim placement. The Town argued that § 1415(e)(3) bars the Panicos from any reimbursement relief, even if on remand they were to prevail on the merits of the IEP, because of their unilateral change of Michael's placement during the pendency of the § 1415(e)(2) proceedings. The court held that such unilateral parental change of placement would not be "a bar to reimbursement of the parents if their actions are held to be appropriate at final judgment." *Id.*, at 799. In dictum the court suggested, however, that a lack of parental consultation with the Town or "attempt to achieve a negotiated compromise and agreement on a private placement," as

contemplated by the Act, "may be taken into account in a district court's computation of an award of equitable reimbursement." *Ibid.* To guide the District Court on remand, the court stated that "whether to order reimbursement, and at what amount, is a question determined by balancing the equities." *Id.*, at 801. The court also held that the Panicos' reliance on the BSEA decision would estop the Town from obtaining reimbursement "for the period of reliance and requires that where parents have paid the bill for the period, they must be reimbursed." *Ibid.*

The Town filed a petition for a writ of certiorari in this Court challenging the decision of the Court of Appeals on numerous issues, including the scope of judicial review of the administrative decision and the relevance to the merits of an IEP of violations by local school authorities of the Act's procedural requirements. We granted certiorari, 469 U. S. 1071 (1984), only to consider the following two issues: whether the potential relief available under § 1415(e)(2) includes reimbursement to parents for private school tuition and related expenses, and whether § 1415(e)(3) bars such reimbursement to parents who reject a proposed IEP and place a child in a private school without the consent of local school authorities. We express no opinion on any of the many other views stated by the Court of Appeals.

Congress stated the purpose of the Act in these words:

> "to assure that all handicapped children have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of handicapped children and their parents or guardians are protected." 20 U. S. C. § 1400(c).

The Act defines a "free appropriate public education" to mean

> "special education and related services which (A) have been provided at public expense, under public supervi-

sion and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with [an] individualized education program." 20 U. S. C. § 1401(18).

To accomplish this ambitious objective, the Act provides federal money to state and local educational agencies that undertake to implement the substantive and procedural requirements of the Act. See *Hendrick Hudson District Bd. of Education* v. *Rowley*, 458 U. S. 176, 179–184 (1982).

The *modus operandi* of the Act is the already mentioned "individualized educational program." The IEP is in brief a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs. § 1401 (19). The IEP is to be developed jointly by a school official qualified in special education, the child's teacher, the parents or guardian, and, where appropriate, the child. In several places, the Act emphasizes the participation of the parents in developing the child's educational program and assessing its effectiveness. See §§ 1400(c), 1401(19), 1412(7), 1415(b)(1)(A), (C), (D), (E), and 1415(b)(2); 34 CFR § 300.345 (1984).

Apparently recognizing that this cooperative approach would not always produce a consensus between the school officials and the parents, and that in any disputes the school officials would have a natural advantage, Congress incorporated an elaborate set of what it labeled "procedural safeguards" to insure the full participation of the parents and proper resolution of substantive disagreements. Section 1415(b) entitles the parents "to examine all relevant records with respect to the identification, evaluation, and educational placement of the child," to obtain an independent educational evaluation of the child, to notice of any decision to initiate or change the identification, evaluation, or educational placement

of the child, and to present complaints with respect to any of the above. The parents are further entitled to "an impartial due process hearing," which in the instant case was the BSEA hearing, to resolve their complaints.

The Act also provides for judicial review in state or federal court to "[a]ny party aggrieved by the findings and decision" made after the due process hearing. The Act confers on the reviewing court the following authority:

> "[T]he court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." § 1415(e)(2).

The first question on which we granted certiorari requires us to decide whether this grant of authority includes the power to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act.

We conclude that the Act authorizes such reimbursement. The statute directs the court to "grant such relief as [it] determines is appropriate." The ordinary meaning of these words confers broad discretion on the court. The type of relief is not further specified, except that it must be "appropriate." Absent other reference, the only possible interpretation is that the relief is to be "appropriate" in light of the purpose of the Act. As already noted, this is principally to provide handicapped children with "a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." The Act contemplates that such education will be provided where possible in regular public schools, with the child participating as much as possible in the same activities as nonhandicapped children, but the Act also provides for placement in private schools at public expense where this is not possible. See § 1412(5); 34 CFR §§ 300.132, 300.227, 300.307(b), 300.347

(1984). In a case where a court determines that a private placement desired by the parents was proper under the Act and that an IEP calling for placement in a public school was inappropriate, it seems clear beyond cavil that "appropriate" relief would include a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school.

If the administrative and judicial review under the Act could be completed in a matter of weeks, rather than years, it would be difficult to imagine a case in which such prospective injunctive relief would not be sufficient. As this case so vividly demonstrates, however, the review process is ponderous. A final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by that IEP has passed. In the meantime, the parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement. If they choose the latter course, which conscientious parents who have adequate means and who are reasonably confident of their assessment normally would, it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials. If that were the case, the child's right to a *free* appropriate public education, the parents' right to participate fully in developing a proper IEP, and all of the procedural safeguards would be less than complete. Because Congress undoubtedly did not intend this result, we are confident that by empowering the court to grant "appropriate" relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case.

In this Court, the Town repeatedly characterizes reimbursement as "damages," but that simply is not the case. Reimbursement merely requires the Town to belatedly pay

expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP. Such a *post hoc* determination of financial responsibility was contemplated in the legislative history:

> "If a parent contends that he or she has been forced, at that parent's own expense, to seek private schooling for the child because an appropriate program does not exist within the local educational agency responsible for the child's education and the local educational agency disagrees, that disagreement and *the question of who remains financially responsible* is a matter to which the due process procedures established under [the predecessor to § 1415] appl[y]." S. Rep. No. 94–168, p. 32 (1975) (emphasis added).

See 34 CFR § 300.403(b) (1984) (disagreements and question of financial responsibility subject to the due process procedures).

Regardless of the availability of reimbursement as a form of relief in a proper case, the Town maintains that the Panicos have waived any right they otherwise might have to reimbursement because they violated § 1415(e)(3), which provides:

> "During the pendency of any proceedings conducted pursuant to [§ 1415], unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child . . . ."

We need not resolve the academic question of what Michael's "then current educational placement" was in the summer of 1979, when both the Town and the parents had agreed that a new school was in order. For the purposes of our decision, we assume that the Pine Glen School, proposed in the IEP, was Michael's current placement and, therefore, that the Panicos did "change" his placement after they had rejected the IEP and had set the administrative review in motion. In

so doing, the Panicos contravened the conditional command of § 1415(e)(3) that "the child shall remain in the then current educational placement."

As an initial matter, we note that the section calls for agreement by *either* the *State or* the *local educational agency.* The BSEA's decision in favor of the Panicos and the Carroll School placement would seem to constitute agreement by the State to the change of placement. The decision was issued in January 1980, so from then on the Panicos were no longer in violation of § 1415(e)(3). This conclusion, however, does not entirely resolve the instant dispute because the Panicos are also seeking reimbursement for Michael's expenses during the fall of 1979, prior to the State's concurrence in the Carroll School placement.

We do not agree with the Town that a parental violation of § 1415(e)(3) constitutes a waiver of reimbursement. The provision says nothing about financial responsibility, waiver, or parental right to reimbursement at the conclusion of judicial proceedings. Moreover, if the provision is interpreted to cut off parental rights to reimbursement, the principal purpose of the Act will in many cases be defeated in the same way as if reimbursement were never available. As in this case, parents will often notice a child's learning difficulties while the child is in a regular public school program. If the school officials disagree with the need for special education or the adequacy of the public school's program to meet the child's needs, it is unlikely they will agree to an interim private school placement while the review process runs its course. Thus, under the Town's reading of § 1415(e)(3), the parents are forced to leave the child in what may turn out to be an inappropriate educational placement or to obtain the appropriate placement only by sacrificing any claim for reimbursement. The Act was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives.

The legislative history supports this interpretation, favoring a proper interim placement pending the resolution of disagreements over the IEP:

> "The conferees are cognizant that an impartial due process hearing may be required to assure that the rights of the child have been completely protected. We did feel, however, that the placement, or change of placement should not be unnecessarily delayed while long and tedious administrative appeals were being exhausted. Thus the conference adopted a flexible approach to try to meet the needs of both the child and the State." 121 Cong. Rec. 37412 (1975) (Sen. Stafford).

We think at least one purpose of § 1415(e)(3) was to prevent school officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings. As we observed in *Rowley*, 458 U. S., at 192, the impetus for the Act came from two federal-court decisions, *Pennsylvania Assn. for Retarded Children* v. *Commonwealth*, 334 F. Supp. 1257 (ED Pa. 1971), and 343 F. Supp. 279 (1972), and *Mills* v. *Board of Education of District of Columbia*, 348 F. Supp. 866 (DC 1972), which arose from the efforts of parents of handicapped children to prevent the exclusion or expulsion of their children from the public schools. Congress was concerned about the apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special classes. See § 1400(b)(4); 34 CFR § 300.347(a) (1984). We also note that § 1415(e)(3) is located in a section detailing procedural safeguards which are largely for the benefit of the parents and the child.

This is not to say that § 1415(e)(3) has no effect on parents. While we doubt that this provision would authorize a court to order parents to leave their child in a particular placement, we think it operates in such a way that parents who unilaterally change their child's placement during the pendency of

review proceedings, without the consent of state or local school officials, do so at their own financial risk. If the courts ultimately determine that the IEP proposed by the school officials was appropriate, the parents would be barred from obtaining reimbursement for any interim period in which their child's placement violated § 1415(e)(3). This conclusion is supported by the agency's interpretation of the Act's application to private placements by the parents:

> "(a) If a handicapped child has available a free appropriate public education and the parents choose to place the child in a private school or facility, the public agency is not required by this part to pay for the child's education at the private school or facility. . . .
>
> "(b) Disagreements between a parent and a public agency regarding the availability of a program appropriate for the child, and the question of financial responsibility, are subject to the due process procedures under [§ 1415]." 34 CFR § 300.403 (1984).

We thus resolve the questions on which we granted certiorari; because the case is here in an interlocutory posture, we do not consider the estoppel ruling below or the specific equitable factors identified by the Court of Appeals for granting relief. We do think that the court was correct in concluding that "such relief as the court determines is appropriate," within the meaning of § 1415(e)(2), means that equitable considerations are relevant in fashioning relief.

The judgment of the Court of Appeals is

*Affirmed.*