788 F.Supp. 673 (1992)
P.J., By and Through his Parents and Next Friends, Mr. and Mrs. W.J., L.G., By and Through her Parents and Next Friends, Mr. and Mrs. L.G., M.L., By and Through his Parents and Next Friends, Mr. and Mrs. J.L., Plaintiffs,
v.
STATE OF CONNECTICUT BOARD OF EDUCATION, Gerald Tirozzi, West Hartford Board of Education, Wethersfield Board of Education, and Windham Board of Education, Defendants.
No. 2:91CV00180 (TEC).
United States District Court, D. Connecticut.
February 18, 1992.
*674 David Shaw, Hartford, Conn., for plaintiffs.
Deborah Freeman, Hartford, Conn., for defendants.

*675 RULING ON APPEAL FROM ADMINISTRATIVE HEARING IN THE MATTER OF L.G.
EAGAN, United States Magistrate Judge.
This action consists of several challenges to the manner in which the State of Connecticut and certain of its municipal boards of education implement and oversee the mandates of the Individuals With Disabilities Education Act and the regulations promulgated thereunder which, broadly stated, require state and local education agencies to provide all handicapped students a free appropriate public education. This memorandum of decision addresses the challenges of one named plaintiff, L.G., by and through her parents and next friends, Mr. and Mrs. L.G. (hereinafter "Lauren"), to the educational program offered by her local educational agency, the Wethersfield Board of Education (hereinafter "the Board").

PROCEDURAL HISTORY
The procedural posture of the present dispute between Lauren and the Board is that of an appeal from a decision rendered by a due process hearing officer at the conclusion of an administrative hearing held in accordance with § 615 of what is now known as the Individuals With Disabilities Education Act (IDEA), 20 U.S.C. § 1415. As such, the court has jurisdiction over this appeal pursuant to 20 U.S.C. § 1415(e)(4)(A). The events which occurred before, during and after the due process hearing are fully discussed below.

FINDINGS OF FACT
The court essentially adopts the findings of fact made by the state due process hearing officer as to events which occurred prior to the initiation of the due process hearing. These findings are further supplemented by the evidence presented to this court at the three days of hearings held in this matter, which primarily addressed the status and educational needs of Lauren between the decision of the hearing officer and the final hearing date.
Lauren is a four-year-old child who has been diagnosed as having mental retardation secondary to Down's Syndrome. The experts testifying in this action agree that the degree of Lauren's retardation is mild to moderate. At a very early age, Lauren's parents were aware that Lauren would need special education services. Beginning at the age of four months, Lauren received such services from the State of Connecticut Department of Mental Retardation (hereinafter "DMR") through that department's Early Intervention Program. As a participant in this DMR program, Lauren received services first on an itinerant basis, but beginning at the age of eighteen months, Lauren received direct services from DMR simultaneous with her attendance at two privately owned day care centers. The special services provided by DMR included physical therapy, occupational therapy and speech therapy. Most of the children attending these day care centers were not disabled, and Lauren was not removed from the day care setting or otherwise segregated from her nondisabled classmates while services were rendered by DMR staff. Lauren's participation in these fully integrated day care programs with services provided by DMR occurred during the 1988-1989 and 1989-1990 school years.
On June 1, 1990, as required by the regulations promulgated to implement the IDEA, the Board held a planning and placement team meeting ("PPT").[1] At the time of this PPT, Lauren was three years' old, *676 and was no longer the responsibility of DMR. The minutes of this PPT meeting indicate that, as of June 1, 1990, the Board had never attempted to evaluate Lauren and had never written an IEP for her. No IEP was written as a result of the June 1 PPT. During the PPT, the Board employees discussed available programs with Lauren's mother, and the minutes reflect that the team recommended that Lauren attend the Wethersfield preschool program. Unlike the preschool programs in which Lauren participated under the auspices of DMR, the Wethersfield program is a partially integrated program where, for two days a week, the handicapped children attend together and receive special services such as speech and language therapy, physical therapy and occupational therapy. On two other days each week, the handicapped children attend the program along with non-handicapped children. The testimony of the Board employees suggests that nearly all special education services are provided on the days when only handicapped children are in attendance, but the Board employees attribute this fact to the work schedules of the speech, occupational and physical therapists. Board employees describe this system as "reverse mainstreaming."
After the June 1, 1990 PPT, the parents refused to sign the PPT minutes because they had reservations about placing Lauren in a program that is only partially integrated, but they promised to observe the Wethersfield program. After observing the program, the parents again expressed their reservations about placing Lauren in an educational environment that is not integrated with non-handicapped children on a full time basis, and asked whether the Board was willing to integrate the program on a full time basis. The Board refused this request.
Thereafter, on July 23, 1990, Lauren's parents received a letter from Joyce Ippolito, the Board's Supervisor of Special Education, stating that the Board's nursery school program would begin on September 11. Lauren's parents responded to this letter on August 21, 1990 by informing the Board, through Ms. Ippolito, that they were enrolling Lauren in a nursery school program at Today's Child in Glastonbury, Connecticut, where Lauren had been previously enrolled while participating in the DMR program. Today's Child did not offer the special education services offered by the Wethersfield program, but Lauren's parents preferred Today's Child because it was fully integrated. In their letter, Lauren's parents requested that the Board schedule a PPT for the purpose of drafting an IEP for the following school year in order to obtain support services from the Board. The Board held PPT meetings on September 28 and October 26, 1990, and after each of the two PPTs, the Board again informed Lauren's parents that its preschool program was the appropriate placement for Lauren, despite the fact that the Board had not evaluated Lauren and no IEP had been written.
At the latter PPT, Lauren's parents requested that the Board place Lauren in a fully integrated preschool program, but the Board refused, stating that its program was the appropriate program for Lauren. During the administrative hearing and the court hearing on this appeal, employees of the Board who participated in Lauren's PPT meetings admitted that they have never placed a handicapped student in a fully integrated preschool or kindergarten program with special education supports. The team finally wrote an IEP for Lauren after the October 28, 1990 PPT meeting.
In response to the Board's refusal to place Lauren in a fully integrated preschool program, on October 31, 1991, Lauren's parents requested a hearing before an independent hearing officer. Prior to the hearing, on November 16, 1990, counsel for the Board sent a letter to counsel for Lauren, explaining the position of the Board regarding Lauren's placement. More importantly, the letter offered to fully integrate the Wethersfield program for all four days each week in an attempt to avoid the administrative hearing and the potential payment of attorney's fees should the parents prevail at the hearing. On November 26, 1990, at the first scheduled hearing, the parents informed counsel for the Board *677 that they accepted the settlement offer, and the hearing was adjourned for that day. However, the Board withdrew the settlement offer after the parents had accepted, at least in part because some of the parents of other handicapped children participating in the preschool program objected to full integration. With the withdrawal of the settlement offer, the parties proceeded with the due process hearing.
During the course of the hearing, the parents presented testimony from Lauren's DMR teacher and a special education consultant to show that the most appropriate educational environment for Lauren would be a fully integrated classroom. The Board similarly presented its own experts, who testified that, although Lauren could be properly educated in a fully integrated environment, the proper placement for her is the Wethersfield preschool program. All of the Board's experts were critical of the Today's Child placement because, unlike the Wethersfield program, the Today's Child classroom was not staffed with persons skilled in speech therapy, physical and occupational therapy, and special education. In addition, Francis Stuart, the Director of Pupil Personnel Services in Wethersfield, testified that, under state law, the Board was severely limited in the amount of money it could spend to provide special education services to Lauren if she were unilaterally placed by her parents in any program other than the Wethersfield preschool program.
In a written opinion dated February 1, 1991, Dr. David Dawson, the independent hearing officer, concluded that the Wethersfield preschool program was an appropriate placement for Lauren. Although the hearing officer faulted the Board for focusing on convincing the parents to accept its program rather than on evaluating and properly placing Lauren in time for the beginning of the 1990-1991 school year, the officer attributed the Board's actions to a "breakdown in communication" between the parents and the Board. The officer found that the parties are not in dispute over the particular goals set forth in Lauren's IEP, but rather, "the least restrictive educational setting, as well as the educational strategies and teaching techniques to be used in delivering an appropriate program in particular settings, is central" to their disagreement. The specific holding of the hearing officer on this issue reads as follows:
The Board's preschool program which is provided as part of a kindergarten center located in one of its elementary schools is a less restrictive environment than a private nursery school setting in another town and therefore meets the requirements of 34 C.F.R. Reg. [sic] 300.552 concerning [the least restrictive environment] for preschool handicapped children.
See Board Exh. 18 at 15.
After the hearing officer's decision was announced, the parents kept Lauren in the Today's Child program. In addition, the parents commenced an action in this court, along with two other sets of parents, challenging unfavorable decisions of due process hearing officers as well as, on an institutional level, the manner in which the State of Connecticut oversees special education in the state. Also at that time, the Board began providing limited services to Lauren at Today's Child in the form of consultations with the Today's Child staff regarding the special services Lauren needed. The Board did not provide any direct services to Lauren, and as of the date of this memorandum of decision, they never have. These limited consultative services ceased at the end of the 1991 school year. By the standards of all of the experts who testified at trial, the level of services provided to Lauren from February, 1991, to the present is inadequate to meet her special education needs.
In June, 1991, the Board contacted Lauren's parents for the purpose of arranging evaluations and writing an IEP for the 1991-1992 school year. Although evaluations were scheduled to take place in early September, 1991, these evaluations were cancelled at the parents' request. Both the Board employees and the parents testified extensively on the reasons for scheduling and cancelling the evaluations, but suffice it to say that the record is replete with *678 examples of miscommunications and conflicts between the Board employees and the parents which, in the end result, have accomplished nothing to further Lauren's progress, but rather, have deprived Lauren of the special education services she needs. As of the date of this decision, Lauren's planning and placement team has not written an IEP for the 1991-1992 school year, she has not been evaluated for the purpose of determining what special education services she is in need of, and she is currently placed in a private, community-based day care program at the Wethersfield YWCA where the only special education services she receives are provided by a private consultant hired by the parents.

DISCUSSION
As stated above, this action comes before the court as an appeal of an administrative due process hearing. As such, the court must first determine the standard of review it must apply to the hearing officer's decision. Next, the court must review the evidence in the record and the applicable law in light of the standard to determine whether the hearing officer's decision is appropriate. Finally, the court must determine what, if any, relief to which Lauren and her parents are entitled.

I. Standard of Review
20 U.S.C. § 1415(e)(2) provides that, in IDEA actions brought in district courts,
the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.
In Board of Education v. Rowley, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Supreme Court announced the following two-question standard for district court review under § 1415(e)(2):
First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.
Rowley, 458 U.S. at 206-207, 102 S.Ct. at 3051. In reviewing administrative determinations in accordance with the above standards, Rowley and its progeny admonish the courts to "be careful to avoid imposing their view of preferable educational methods upon the States." Id. at 207, 102 S.Ct. at 3051; Briggs v. Board of Education, 882 F.2d 688, 692 (2d Cir.1989). The district courts will avoid imposing their own educational views upon state and local education agencies by giving "due weight" to the decision of the records of the administrative proceedings. Rowley, 458 U.S. at 206, 102 S.Ct. at 3050-51.
The Rowley standards speak only to the questions of whether or not a state or local educational agency has complied with the procedural requirements of the Act and whether or not a handicapped student's individualized educational program is reasonably calculated to enable the child to benefit from his or her education. But the regulations promulgated under the Act impose an additional requirement which was not central to the Rowley court, namely, the mandate that local education agencies such as the Wethersfield Board insure
(1) That to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and
(2) That special classes, separate schooling or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.
34 C.F.R. § 300.500. This regulation is promulgated in accordance with 12 U.S.C. § 1412(5)(B), which provides that states must establish procedures to assure that handicapped children are educated with non-handicapped children "to the maximum *679 extent appropriate." The Rowley court acknowledged that this provision of the Act is evidence of Congress's preference in favor of "mainstreaming" handicapped children, Rowley, 458 U.S. at 181, n. 4, 102 S.Ct. at 3038, n. 4, and indeed held that the fact that the handicapped child in Rowley was progressing academically from grade to grade in mainstream public school classes with special services and professional consideration was dispositive of the question of whether that student was receiving a "free appropriate public education" within the meaning of the Act. Id. at 203, n. 25, 102 S.Ct. at 3049, n. 25.
The final consideration to be factored into this court's review of the administrative decision is the rather harsh reality that the Act does not require states to "maximize the potential of handicapped children." Rowley, 458 U.S. at 189, 102 S.Ct. at 3042. Thus, in reviewing agency determinations under the Act, courts must be mindful of the fact that "appropriate" does not mean "potential-maximizing." Id. at 197, n. 21, 102 S.Ct. at 3046, n. 21 ("The Act's use of the word `appropriate' thus seems to reflect Congress' recognition that some settings simply are not suitable environments for the participation of some handicapped children.") Rather, the Act requires educational agencies to provide, as the "`basic floor of opportunity' ... access to specialized services which are individually designed to provide educational benefit to the handicapped child." Id. at 201, 102 S.Ct. at 3048; Kerkam v. McKenzie, 862 F.2d 884, 886 (D.C.Cir.1988) ("proof that loving parents can craft a better program than a state offers does not, alone, entitle them to prevail.").
In sum, the court in this case must afford some deference to the findings of the hearing officer, and may not substitute in place of the administrative decision the personal education philosophy of the court. The court must review the record for procedural irregularities and determine whether Lauren's educational program is individually designed to provide educational benefit to the handicapped child. In addition, because the central issue in this case is the question of whether or not Lauren's IEP assures that, to the maximum extent appropriate, she will be educated with non-handicapped children, the court must determine whether her recommended placement in the Wethersfield preschool program satisfies the mainstreaming presumption of the Act.

II. Review of Administrative Decision
When viewed in light of the above standards, the hearing officer's decision in this action is unsupported by the facts in the record and incorrect as a matter of law. The procedural events leading up to the writing of Lauren's IEP, the uncontroverted testimony of the witnesses for both parties and the regulations promulgated under the Act support only one conclusion  that the Board's recommended placement of Lauren violated the express provisions of the Act and the pertinent regulations.
First, it is undisputed that the Board employees who are members of Lauren's PPT committed several procedural violations as prohibited by the Act. The Board employees on the team recommended the Wethersfield preschool program as the proper placement for Lauren prior to ever evaluating Lauren or reviewing the results of evaluations performed by the Department of Mental Retardation, in violation of 34 C.F.R. § 300.531.[2] In addition, the Board members did not write an IEP prior to attempting to enroll Lauren in the preschool program, in violation of 34 C.F.R. § 300.342.[3] In light of these irregularities, *680 the hearing officer admonished the Board, writing that "[t]he Board should have focused more closely on [Lauren's] unique needs rather than on presenting an existing process and program to her parents through which her needs would be met."
The hearing officer's admonition falls short of the mark; by failing to comply with the procedural requirements of evaluating Lauren and writing an IEP prior to recommending placement, the Board failed to adequately inquire into the particular, individualized special education needs of Lauren as is mandated by the Act and the regulations promulgated thereunder. What the Board did was to almost blindly recommend its existing program to Lauren's parents without professionally evaluating Lauren to determine precisely what special education services she needed. As a result, the Board's decision to place Lauren in a less than totally integrated setting was unfounded.
As stated above, the Act and the regulations require that handicapped children be educated with non-handicapped children "to the maximum extent appropriate." 20 U.S.C. § 1412(5)(B); 34 C.F.R. §§ 300.550-300.556. This "preference in favor of `mainstreaming'" Rowley, 458 U.S. at 181, n. 4, 102 S.Ct. at 3038, n. 4, may be overcome by a finding that "the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily...." 20 U.S.C. § 1412(5)(B); Rowley, 458 U.S. at 181, n. 4. In addition, the Comment following 34 C.F.R. §§ 300.550-300.556 states that the presumption in favor of mainstreaming may be overcome upon a showing that "a handicapped child is so disruptive in a regular classroom that the education of other students is significantly impaired [because] the needs of the handicapped child cannot be met in that environment." In the case of Lauren, the Board made no such finding, and at the hearings offered no such evidence, to support the conclusion that Lauren would be disruptive or otherwise would not benefit from placement in a fully integrated setting. Indeed, both the Wethersfield preschool teacher and the Supervisor of Special Education testified that Lauren could be educated in a fully integrated program with the necessary special education supports, and that Lauren would also benefit from the "incidental learning" that occurs purely by virtue of her interaction with non-handicapped agemates.
The Board also relies upon the Comment to §§ 300.550-300.556 in support of its argument that its partially integrated program is nonetheless the appropriate placement for Lauren. Specifically, the Board notes that the Comment provides school boards with alternatives to establishing fully integrated preschool programs solely for the purpose of meeting the least restrictive environment mandate of §§ 300.550-300.556.[4] However, as the full text of the Comment provision clearly states, the alternatives presented do not absolve school boards from placing handicapped preschool children in the least restrictive environment appropriate to meet their individual education needs. The Board's incorrect reading of the Comment *681 is further proof that it failed to evaluate and consider Lauren's individual needs prior to making its placement recommendation.
In this case, the Board wrote an IEP and recommended a special education placement and the provision of certain services without first evaluating Lauren. The Board's recommended placement is not, according to its own special education employees, the least restrictive environment in which Lauren could receive an appropriate education. The record does not contain any evidence that Lauren's placement would be disruptive to non-handicapped students, as required under the Comment to 34 C.F.R. § 300.550-300.556, or that Lauren's handicap is of such severity that she would not be able to benefit from a fully integrated setting. See Rowley, 458 U.S. at 181, n. 4, 102 S.Ct. at 3038, n. 4 and 20 U.S.C. § 1412(5)(B). To the contrary, the special education experts testifying at the hearing in this court all stated that Lauren is progressing in her current, fully-integrated placement despite the absence of necessary special education services. Thus, the Board has failed to show that the record supports the placement of Lauren in a program that is not the least restrictive education environment. Wilson v. Marana Unified School District, 735 F.2d 1178, 1183 (9th Cir.1984). As stated above, Lauren's right to a free appropriate public education in the least restrictive environment is a right guaranteed by the Act and procedurally protected by the regulations promulgated in accordance with the Act. The Board's failure to identify factors specific to Lauren's needs which would justify placement in a setting other than the least restrictive violated the procedure established by the Act.
In further support of its placement decision, the Board raises other arguments, none of which are persuasive. First, inherent in this proceeding and the argument of the Board, is the suggestion that courts must consider the expense incurred in educating special needs children when reviewing the placement decision of a local school board. At least three circuits have held that cost is a relevant factor in determining whether a placement is appropriate under the Act. See A. W. By & Through N. W. v. Northwest R-1 Sch. Dist., 813 F.2d 158 (8th Cir.1987); Department of Educ. v. Katherine D., 727 F.2d 809 (9th Cir.1983), cert. denied, 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 260 (1985); Age v. Bullitt County Pub. Schools, 673 F.2d 141 (6th Cir.1982). Without deciding whether the Act allows courts to consider the cost of a placement when reviewing a recommended placement the court observes that the Board presented no evidence of the expense of placing Lauren in a private setting or the expense of fully integrating its own program. Evidence of cost in this case was limited to the amount of special education funds which Wethersfield would be able to use to purchase services to support a unilateral placement chosen by Lauren's parents. In addition, the hearing officer's decision makes no mention of cost factors. Thus, the court will not engage in speculative discussions of the cost benefits of placing Lauren in the existing Wethersfield program as opposed to a properly supported private school setting.
Second, the Board argues that the integration issue is merely one of several factors to be considered when determining the proper special education placement for a handicapped child. In support of this argument, the Board cites language in Rowley and subsequent circuit court cases which supports the proposition that courts should defer to state and local education agency determinations of what is the most suitable method for educating a particular child. See e.g., Rowley, 458 U.S. at 207, 102 S.Ct. at 3051; Lachman v. Illinois State Board of Education, 852 F.2d 290 (7th Cir.), cert. denied, 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988). The reason courts should defer to agency determinations is the recognition that the special education personnel are more qualified than the courts to strike an appropriate balance between the preference for mainstreaming on the one hand, and the special services needed by a handicapped child on the other. However, in this case, the Board employees never evaluated Lauren *682 or identified any other factors which would support the conclusion that Lauren could not be placed in an environment which was less restrictive than the Wethersfield preschool program. Further, the IEP written by the Board employees does not specifically identify any special services which are more appropriately provided in a less than fully integrated setting. Indeed, the IEP does not identify how any of the goals listed therein would be accomplished. The failure of the Board employees to evaluate Lauren and write an IEP based upon their evaluation, and the lack of any evidence supportive of the conclusion that the Wethersfield preschool program is the least restrictive environment in which Lauren may receive an appropriate public education, is fatal to the Board's arguments and distinguishes this case from Rowley and Lachman.
In sum, the overwhelming evidence in the record establishes that the Board's decision to place Lauren in its preschool program was based on the fact that Lauren is handicapped, rather than on the professional review of available alternatives and the recommendations of experts familiar with the particular special education needs that are incidental to Lauren's handicap. Such a placement decision is clearly inconsistent with the procedural requirements of the Act and the regulations. Therefore, in accordance with 20 U.S.C. § 1415(e)(2), the court must grant to the parents such relief as it determines is appropriate.

III. Relief
The parents request several forms of relief, including an order that the Board fully integrate its preschool program or that Lauren be placed in a fully integrated program, or an order that the Board provide support services to Lauren at the YWCA program in the following areas and amounts of time: special education consultation (1 to 1½ hours per week), physical therapy (one hour per month), speech and language therapy (two 30-45 minute sessions per week) and occupational therapy consultation (30 minutes per week). The parents also request an order requiring Wethersfield to reimburse them for all out of pocket expenses incurred in the last two years for tuition at private school settings and for hiring a special education consultant.
First, with respect to an order regarding the provision of special education services, the court must abide by the standard it has criticized the Board for failing to follow. There have been no evaluations of Lauren in more than two years, and the experts who testified at trial appear to agree that toddlers change considerably in that span. Therefore, the court will issue an order requiring the Board to, if it has not already done so, evaluate Lauren in all necessary areas. In addition, immediately after the completion of the evaluation process, a PPT must be held and an IEP written which complies with the regulations and avoids the particular shortcomings pointed to in this memorandum of decision. The evaluation process shall be completed and an IEP written no later than March 16, 1992.
With respect to placement in a fully integrated program, the court again will abide by its own standard. Once Lauren is evaluated and an IEP is written, Lauren must be placed in the least restrictive environment appropriate to meet her special education needs. Lauren's placement must be based upon the IEP, and if the recommendation is for placement in anything other than a fully integrated program with appropriate special education services provided in the fully integrated setting, then the IEP must detail all reasons for not placing Lauren in the least restrictive environment. The court shall retain jurisdiction over this appeal until such time as the Board has completed evaluations, written an IEP and made a placement recommendation.[5]
*683 Finally, the court will not order that the Board reimburse the parents for their out-of-pocket tuition and consultant expenses. In School Committee of Burlington v. Department of Education, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), the Supreme Court held that courts may award retrospective reimbursement of out-of-pocket expenses incurred by parents who place their child in private schools if the "private school placement desired by the parents was proper under the Act and that an IEP calling for placement in a public school was inappropriate." Id. at 370, 105 S.Ct. at 2002; Tice v. Botetourt County School Bd., 908 F.2d 1200, 1206 (4th Cir.1990). In this case, there is no evidence to support a finding that the placement of Lauren in either Today's Child or the Wethersfield YWCA programs was an appropriate placement within the meaning of the Act. Neither placement was staffed with the professionals needed to provide speech and language therapy, or physical and occupational therapy, and the classroom teachers at these placements were not certified in special education. Indeed, the Today's Child and YWCA placements were antithetical to the Wethersfield placement with respect to mainstreaming and special education services; just as the Wethersfield program was not the least restrictive environment, the Today's Child and YWCA programs were not the programs which provided appropriate special education services. An award of reimbursement of out-of-pocket expenses is not warranted in this case.

CONCLUSION
For the foregoing reasons, it is ORDERED:
1. On or before March 9, 1992, the Board shall complete evaluations of Lauren in all necessary areas, a PPT meeting shall be held and an IEP shall be written.
2. On or before March 16, 1992, the parties shall notify the court in writing of the following: (a) the recommended placement for Lauren in light of the results of the evaluations ordered above, including a copy of the IEP; (b) whether the hearing should be reopened for the purpose of considering the recommendations of the IEP; and (c) if the hearing needs to be reopened, a list of all witnesses and exhibits which will be presented at such hearing.
The parties have consented to proceed to judgment before the undersigned in accordance with 28 U.S.C. § 636(c)(1).
NOTES
[1] 34 C.F.R. § 300.343 provides that school boards such as the Wethersfield Board are "responsible for initiating and conducting meetings for the purpose of developing, reviewing, and revising a handicapped child's individualized education program." These meetings must be held prior to every school year, 34 C.F.R. § 300.342, and must yield a written individualized education program ("IEP") which states the individual child's current level of achievement, goals for the upcoming year, specific services to be rendered, dates for the implementation of the IEP and criteria for evaluating the child's progress. 34 C.F.R. § 300.346. The IEP is produced by what is known as the planning and placement team ("PPT"), which must include a qualified special education representative of the school board, the child's teacher, and one or more of the child's parents, and may also include individuals who evaluate the child or provide special education services to the child. See 34 C.F.R. § 300.344 and 300.345.
[2] 34 C.F.R. § 300.531 provides:

Before any action is taken with respect to the initial placement of a handicapped child in a special education program, a full and individual evaluation of the child's educational needs must be conducted in accordance with the requirements of § 300.532.
34 C.F.R. § 300.532 provides standards to assure that all testing is done in a professionally acceptable manner and is comprehensive in its scope.
[3] 34 C.F.R. § 300.342(b) provides, in pertinent part, that

An individualized education program must: (1) Be in effect before special education and related services are provided to a child; and (2) Be implemented as soon as possible following the [PPT] meetings....
[4] The Comment section relied upon by the Board reads as follows:

Public agencies that do not operate programs for non-handicapped preschool children are not required to initiate such programs solely to satisfy the requirements regarding placement in the least restrictive environment embodied in §§ 300.550-300.556. For these public agencies, some alternative methods for meeting the requirements of §§ 300.550-300.556 include:
(1) Providing opportunities for the participation (even part-time) of preschool handicapped children in other preschool programs operated by public agencies (such as Head Start);
(2) Placing handicapped children in private school programs for non-handicapped preschool children or private school preschool programs that integrate handicapped and non-handicapped children; and
(3) Locating classes for handicapped preschool children in regular elementary schools.
In each case the public agency must ensure that each child placement is in the least restrictive environment in which the unique needs of the child can be met, based upon the child's individualized education program, and meets all of the other requirements of §§ 300.340-300.349 and §§ 300.550-300.556. (Emphasis added).
[5] While the court is willing to retain jurisdiction for the purpose of assuring that its orders are enforced, the parties are reminded that the ultimate goal in evaluating Lauren, holding a PPT, writing an IEP and making a placement recommendation is to do what is best for the child as an individual, within the parameters established in the Act and regulations. This has not always been true in the past. If the parties work toward this end, further court action should not be necessary.