**Marsha J. THOMAS, Parent and Legal Representative of Kristen Caroline Thomas, Petitioner,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–2022 V.

United States Court of Federal Claims.

Dec. 7, 1992.

Terrell W. Oxford, with whom was Thomas A. Adams, Dallas, TX, for petitioner.

Gerard W. Fischer, with whom were Asst. Atty. Gen. Stuart M. Gerson, Director Helene M. Goldberg, Deputy Director John Lodge Euler, and Asst. Director Charles R. Gross, Washington, DC, for respondent.

OPINION

WIESE, Judge.

In a decision following remand issued by the special master on August 14, 1992, the petitioner, Kristen Thomas, was awarded compensation, pursuant to the National Childhood Vaccine Injury Act (the Vaccine Act), 42 U.S.C.A. §§ 300aa–1—300aa–34 (West 1991 & Supp.1992), to meet the special educational needs of her vaccine-caused learning disabilities.[1] In her award of compensation, the special master gave no recognition to any special education assistance

---

1. Petitioner suffered an encephalopathy and shock-collapse following the administration of a diphtheria-pertussis-tetanus vaccination on October 27, 1988. As a result, she now suffers from various neurological impairments including central auditory processing dysfunction, deficient sensory motor integration functioning, and attention deficit disorder.

that Kristen's local public school system (Oak Ridge, Tennessee) might be expected to provide through the state's participation in the federally-sponsored Individuals With Disabilities Education Act (IDEA) (formerly the Education of the Handicapped Act), 20 U.S.C.A. §§ 1400–1485 (West 1990 & Supp.1992).

Respondent now seeks our review of the special master's decision. The appeal is based on the contention that, in awarding compensation without regard to Tennessee's primary role in identifying and in paying for petitioner's special educational needs, the special master has violated the restriction set out in section 2115(g) of the Vaccine Act (42 U.S.C.A. § 300aa–15(g)). That section prohibits the use of Program funds for items or services for which payment "can reasonably be expected to be made ... under any State compensation program."

The parties have had the opportunity to submit written briefs on the issue supplemented by oral argument. At the conclusion of the argument (heard November 24, 1992) the court announced a tentative bench ruling in petitioner's favor and also expressed the intention to address the issue more fully in a written opinion. We now affirm the special master's decision.

### I

This case was last before us on a motion for review of the special master's initial decision, issued November 21, 1991. That decision awarded petitioner compensation for special education assistance in the form of occupational therapy, individual and group educational therapy, psychological counseling and private schooling. Respondent challenged the award on the ground that the special master had erred, as a matter of law, in deciding that Kristen Thomas' unique learning needs would not be adequately addressed through the special education assistance the State of Tennessee could be expected to provide to her under the IDEA.

The appeal was sustained because the special master's determination against the availability of benefits under the IDEA had not been based upon petitioner's actual experience. Rather, the special master drew that conclusion from the testimony of a specialist in education who, although familiar with the operation of state special education programs in general, had no actual knowledge of the IDEA's implementation in the Tennessee school system. This court ruled that such evidence offered an insufficient basis upon which to discount either the availability, or the beneficial value, of any special education assistance petitioner might receive under the IDEA, especially since Kristen Thomas' disabilities appeared to place her squarely within the class of those whom the Act was intended to reach.

Accordingly, we remanded the case to the special master with instructions that petitioner proceed with a formal request for benefits under the IDEA. Our order stated:

> [T]o satisfy the Vaccine Act's prohibition against the allowance of compensation for an item or service for which payment "can reasonably be expected to be made ... under any State compensation program," 42 U.S.C.A. § 300aa–15(g), petitioner [must] ascertain the extent of the educational assistance available to her under the IDEA by proceeding with [that] Act's threshold administrative requirements. Armed with the results of the IEP [Individual Education Plan] (or, if it is the case, a formal evaluation denying any entitlement), petitioner may then go before the Office of Special Masters to obtain whatever additional relief the circumstances of the case may justify.

Order Vacating, In Part, Special Master's Decision and Remanding For Further Proceedings, at 5 (May 14, 1992).

Pursuant to the court's directive, petitioner requested that the Tennessee public school system evaluate the level of her intellectual functioning and develop an education plan appropriate to the redress of any determined deficiencies. This was done. Assessment specialists in what is known as the "evaluation team" examined Kristen through a series of cognitive skill tests. These tests revealed that, while Kristen was then functioning at or near her

potential in nearly all skill areas, she was, nevertheless, experiencing a significant discrepancy between her intellectual potential and her achievement in written expression. Because of this result, Kristen was considered to have a handicapping condition and was therefore certified "learning disabled."

To address the situation, an education plan was proposed which involved, to start with, a twice-monthly monitoring, by a special education specialist, of petitioner's in-school progress. Additionally, although Kristen's scholastic record to date has not been noticeably marred by her learning disability, in the event of any perceived deterioration in the areas of spelling and written expression, the IEP would be reexamined and revised.

Following the completion of the initial administrative process (the development of the IEP), petitioner's case was again taken up by the special master. After evaluating the IEP, the special master concluded that there would be no duplication in services between those contemplated in the IEP and the more rigorous therapies that had been recommended by petitioner's rehabilitation experts. The special master expressed her thoughts this way:

> It is apparent from the description of the consultations to be provided under the IEP that they are token services only, and fail to address Kristen's underlying neurological deficits. The services offered differ significantly, in kind, quality, and purpose from those therapies recommended by petitioner's rehabilitation experts and determined by the court to be necessary. The services recommended by Kristen's professional diagnosticians, Dr. Hansen [petitioner's expert] explains, are not simply to assist her in her homework, but are designed to develop compensating cognitive techniques: "Kristen must learn bridging and other strategies to teach the brain to function." The IEP contemplates neither the mechanism nor the sustained level of intervention required to achieve this goal—*i.e.*, developing alternative methods of accommodating for impaired functioning of the brain.

*Thomas v. Secretary of the Dep't of Health & Human Servs.*, No. 90–2022 V, slip. op. at 4, 1992 WL 210077 (Cl.Ct.Sp. Mstr. Aug. 14, 1992).

After noting that the IEP did not address the root cause of Kristen's "unique dysfunctional problems," *id.*, the special master determined it to be both necessary and reasonable to reaffirm the compensation award set out in her original decision. From this reaffirmation of decision respondent now appeals.

■ The crux of the argument on appeal is that the IDEA represents the central statutory authority for dealing with the problems encountered in the education of the learning-disabled child. Therefore, once a child has been determined to be learning disabled—the case here—it becomes the obligation of a state, if receiving federal funds as a participant in the IDEA, to provide that child with a free appropriate public education. Given this claim to primacy of the IDEA in the education of the handicapped, respondent argues that additional compensation under the Vaccine Act for the same essential purpose—special education—is statutorily impermissible. That is to say, compensation may not be paid out under the Vaccine Program for an item or service whose costs can reasonably be expected to be borne by other public or private funds. 42 U.S.C.A. § 300aa–15(g).

As a sub-part to this argument, respondent also contends that because the IDEA is in fact the principal legislation dealing with the education of the learning-disabled child, determinations of educational needs rendered under its authority must be given deference. The special master, in other words, is not free to second-guess the wisdom of an IEP but must, instead, accept as sufficient the diagnostic evaluations and professional judgments it incorporates. Respondent goes on to say that if, indeed, a vaccine petitioner considers an applicable IEP to be deficient, then the proper remedy for that grievance rests in the administrative and judicial review mechanisms named in the IDEA and not in a request for supplementary relief before a special master.

## II

Implicit in the argument respondent presents is the premise that the educational benefits afforded a handicapped child under the IDEA are essentially the same as those awardable under the Vaccine Act. We cannot agree with this position. In our view the two statutes are not directed to the same goals and the relief they provide will seldom be more than complementary.

To consider the IDEA first, that statute's principal aim is to secure for all handicapped children a "free appropriate public education." 20 U.S.C.A. § 1412(1). In examining the meaning of that term, the Supreme Court, in *Board of Educ. of the Hendrick Hudson Cent. School Dist. v. Rowley*, 458 U.S. 176, 192, 102 S.Ct. 3034, 3043, 73 L.Ed.2d 690 (1982), noted that "the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." Against that background, the Court went on to say that the basic floor of opportunity provided by the Act "consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201, 102 S.Ct. at 3048. But this requirement, the Court further declared, "generates no additional requirement that the services so provided be sufficient to maximize each child's potential 'commensurate with the opportunity provided other children.'" *Id.* at 198, 102 S.Ct. at 3046. In short, an appropriate public education under IDEA means an education sufficient to confer some educational benefits.

The concerns of the Vaccine Act and the remedies it affords are much different from those identified with the IDEA. Two related considerations prompted the enactment of the vaccine compensation program. First, the need to encourage the continued availability of important childhood vaccines by relieving the manufacturers of these vaccines from the burdensome costs of litigation imposed by vaccine-related negligence actions; second, the equally pressing need to provide the small but predictable number of those children injured by the administration of a vaccine with a compensation system more efficient and less costly than the conventional negligence action. H.R.Rep. No. 908, 99th Cong., 2d Sess. 1–7 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344–6348.

To secure these ends, Congress enacted, in the form of the Vaccine Act, what essentially amounts to a no-fault compensation scheme, at least for the majority of vaccine-based injuries. Although the Vaccine Act does not foreclose a claimant from pursuing a conventional civil action against a vaccine manufacturer, it does attempt to minimize the likelihood of such suits. That objective is promoted, first, by making resort to the Vaccine Program a mandatory step, and, second, by providing a system of compensation under that Program that in many respects emulates the compensation recoverable under the traditional tort system.

Thus, for example, under the Vaccine Program, a petitioner may be awarded compensation for past and future medical expenses; for special equipment and special therapies (including behavioral and emotional therapies); for rehabilitation and special education; for residential and custodial care; for loss of earnings; and for actual and projected pain and suffering. 42 U.S.C.A. § 300aa–15(a). It is clear, therefore, that the Vaccine Act addresses both the pecuniary and the non-pecuniary losses that a vaccine claimant may suffer.

And while that compensation scheme is not the full and perfect equivalent of a tort remedy, (punitive damages, for example, are not allowed, *id.* § 300aa–15(d)(1), and compensation for death and for pain and suffering are each capped at $250,000, *id.* § 300aa–15(a)(2), (4)), it clearly endeavors to compensate for the harm done by attempting to restore the injured claimant to his former status, both physically and economically. To use Congress' own description, it is "an appealing alternative to the tort system." H.R.Rep. No. 908, 99th Cong. 2d Sess. 26 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344, 6367.

This then brings us to the point of the discussion. Given the concerns which led to the enactment of the Vaccine Act, it would surely thwart the will of Congress to hold that the Act's promise of "reasonable" compensation for "special education" (42 U.S.C.A. § 300aa–15(a)(1)(A)(iii)(II)) means something less than the compensation necessary to restore the vaccine-injured child's learning capacity. Yet, to adopt the reasoning which respondent urges upon us here would bring about just that result. That in turn would encourage claimants, like petitioner, to abandon the Vaccine Program in favor of pursuing their civil remedies against the vaccine manufacturers. Neither the text of the Vaccine Act nor its legislative history warrants our reading the "special education" language of the statute in such a self-defeating way.

Based on the reasons discussed above, we conclude that the IDEA and the Vaccine Act seek the accomplishment of different objectives; therefore, what may suffice as an acceptable special education plan under the IDEA is not to be taken as the measure of compensation awardable under the Vaccine Act. Compensation is awardable under the Vaccine Program for educational needs not addressed in an IEP.

█ There remains for consideration respondent's contention that deficiencies in an IEP may be challenged through an administrative appeal which, if successful, could serve to eliminate the necessity for any supplementary award under the Vaccine Program. The argument therefore is that this potential for expanding an IEP should be taken into account by a special master in assessing the amount of compensation to award under the Vaccine Act.

We decline to so rule. The Vaccine Act calls for the payment of compensation under the Program to be withheld only where payment from another source either has been made or can "reasonably" be expected to be made. 42 U.S.C.A. § 300aa–15(g). To require, as a condition of payment under the Vaccine Act, that a claimant exhaust what the Supreme Court has described as the "ponderous" review mechanisms of the IDEA, *School Comm. of Bur-*

*lington v. Department of Educ.*, 471 U.S. 359, 370, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985), is tantamount to denying a vaccine claimant any compensation for special education. Again, we say, this could hardly be what Congress had in mind when it enacted a compensation system that it intended to be "expeditious and fair." H.R.Rep. No. 908, 99th Cong. 2d Sess. 12 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News at 6353.

### III

For the reasons stated, the special master's decision on remand, filed August 14, 1992, is affirmed.

