**Terrence and Karen DONLAN, Plaintiffs**

v.

**WELLS OGUNQUIT COMMUNITY SCHOOL DISTRICT, Defendant**

**No. CIV.02–94–P–DMC.**

United States District Court, D. Maine.

Oct. 28, 2002.

Terrence Donlan, Wells, ME, Pro se.

Karen Donlan, Wells, ME, Pro se.

Eric R. Herlan, Esq., Drummond, Woodsum & MacMahon, Portland, ME, for Wells Ogunquit Community School District, Defendant.

*FINDINGS OF FACT AND
CONCLUSIONS OF
LAW* [1]

DAVID M. COHEN, United States Magistrate Judge.

Terrence and Karen Donlan, parents of a highly intelligent autistic student enrolled at Wells High School in Wells, Maine, contend that the manner in which a Maine Department of Education ("DOE") hearing officer adjudicated their partial appeal from the decision of a DOE complaint investigator violated their right to a fair and impartial hearing pursuant to section 1415(f)(1) of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.,* and section 13 of the Maine Special Education Regulations ("MSER"), Code Me. R. 05–071 ch. 101. Memorandum of Law and Argument ("Plaintiffs' Brief") (Docket No. 12) at 1; Amended Complaint, attached to Notice of Removal (Docket No. 1); Administrative Record ("Record") at 152. After careful review of the Record and the parties' memoranda of law, I make the following findings of fact and conclusions of law, on the basis of which I conclude that the Donlans' right to a fair and impartial hearing was not infringed.[2]

## I. Findings of Fact

1. Bryan J. Donlan, the Donlans' son, was born on May 24, 1988. Record at 130. He is a gifted student with a type of autism known as Asperger's Syndrome. *Id.* at 130, 152. He has significant difficulties writing and interacting with his peers. *Id.* at 132; Transcript of Due Process Hearing ("Transcript"), *Donlan v. Wells–Ogunquit,* Case No. 01–264 (Me. Dep't of Educ.), Vol. I at 43–45.[3]

2. In early June 2000 Bryan's parents and the Wells Ogunquit Community School District ("School District") jointly decided that he should be advanced to high school, skipping eighth grade. Record at 57–59; Transcript, Vol. II at 204. This was the second occasion on which Bryan had been double-promoted. Transcript, Vol. II at 231.

3. An individualized education program ("IEP") was developed for Bryan at Wells High School that provided a full-time educational technician to work one-on-one with him throughout the school day, as well as occupational therapy, speech/language services and classroom modifications. *See, e.g.,* Record at 91–92, 97–99.

4. Bryan completed his freshman year of high school. Transcript, Vol. II at 233. Shortly thereafter, his parents filed a complaint with DOE stating that his "right to a free appropriate public education (FAPE) under the Individuals With Disabilities Act (IDEA) has been violated numerous times by the Wells-[Ogunquit]

---

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge David M. Cohen conduct all proceedings in this case and order entry of judgment.

2. The parties agreed, and the revised scheduling order in this case directed, that the court would decide the issues before it on the basis of the administrative record filed with the court and the parties' memoranda of law setting forth their respective legal positions and arguments. Report of Conference of Counsel and Revised Scheduling Order (Docket No. 10) at 2. A two-volume administrative record was filed, supplemented by a separate transcript of the second (and final) day of the underlying hearing that inadvertently was omitted from that record.

3. For ease of reference and in accordance with the convention adopted by the parties in their briefs I shall refer to both the transcript of the first day of the underlying due-process hearing, contained on pages 1010–60 of the Record, and the transcript of the second day, filed separately, as "Transcript," citing the consecutively numbered pages of the Transcript itself rather than Record pages.

School District personnel. Wells–Ogunquit School District personnel have demonstrated a pervasive pattern of non-compliance with special education laws and regulations." Record at 883.

5. Dr. Jeannie Hamrin was assigned as complaint investigator. *See id.* at 37.

6. After reviewing documentation submitted by the parties, conducting interviews (some in person and some by telephone) and holding a complaint resolution meeting, Dr. Hamrin issued a fifteen-page report dated September 20, 2001, *id.* at 37–51, finding in favor of the Donlans as to the following: Allegation # 2 (failure to implement some goals, objectives and modifications of the IEPs dated September 20, 2000 and April 1, 2001), Allegation # 3 (failure to provide prior written notice of intent to refuse or initiate portions of the September 20, 2000 IEP) and Allegation # 5 (failure to address in the September 20, 2000 and April 1, 2001 IEPs the extent to which Bryan would participate with non-disabled students), *id.* at 48–50.

7. Dr. Hamrin found against the Donlans as to the following: Allegation # 1 (failure to provide Bryan with a free appropriate public education that emphasized special education and supportive services designed to meet his unique needs in the least restrictive educational alternative during the 2000–01 school year), Allegation # 4 (failure to consider how the student would be involved with the general curriculum while placed at Wells High School) and Allegation # 6 (failure to pursue an out-of-district placement). *Id.* at 46–47, 49–50.

8. In a cover letter dated September 21, 2001 transmitting Dr. Hamrin's report, DOE commissioner J. Duke Albanese informed the Donlans, in relevant part:

This letter is to provide you with the Complaint Investigation Report on the above referenced complaint. This decision is final and binding.

\*　　\*　　\*　　\*　　\*　　\*

If either party wishes to challenge the complaint investigation report, per Maine Education and School Statutes, Title 20–A, § 7206(4):

**APPEAL**: A parent or a school administrative unit may challenge a complaint investigation report by requesting a due process hearing within 30 days of the receipt of the complaint investigation report.

*Id.* at 35–36.

9. The School District did not appeal the complaint investigator's ruling. Transcript, Vol. II at 246. On or about October 10, 2001 the Donlans filed a request for a hearing, stating: "The Wells–Ogunquit School District failed to carry out Bryan Donlan's Individualized Education Plan, and thereby denied him a Free Appropriate Public Education, during the 2000–2001 school year. The Complaint Investigator's conclusion to the contrary, in Complaint # 01.184, Allegation # 1, is based upon factual error and a failure to apply the law correctly to the facts of the case." Record at 2.

10. Peter Stewart, Esq., was assigned as hearing officer in the case. *See id.* at 4–5. By letter dated October 16, 2001 confirming his appointment, Albanese informed Stewart and the parties that a pre-hearing conference would be held at which "the parties will clarify the issue(s) of the hearing, consider any stipulations, and discuss what to expect at the hearing itself." *Id.* at 4. Albanese advised the parties to bring to the conference, among other things, a statement of "the issues each party believes to be involved in this hearing; . . . the Findings each party expects to emerge from the hearing; . . . [and] the

Conclusions each party believes will be reached[.]" *Id.* at 4–5.

11. The Donlans submitted a list of thirty-nine findings they expected the hearing officer to make, including lack of a behavior plan, failure to mainstream Bryan at lunch and lack of educational programming during the first block of school three days a week. *Id.* at 849–52 & ¶¶ 22–37.

12. In a pre-hearing memorandum dated December 10, 2001 Eric Herlan, Esq., counsel for the School District, characterized the Donlans' appeal as "limited to the question of whether certain violations found by the Investigator warrant a compensatory education order." *Id.* at 821.

13. A pre-hearing conference was held on December 12, 2001 in Sanford Maine at which the parties' pared down the Donlans' list of issues. *Id.* at 987; Transcript, Vol. I at 21–24. No transcript of this conference appears of record, and the School District represents in its brief that there is none. *See* [Defendant's Brief] (Docket No. 13) at 11 n. 6.

14. The hearing spanned two days: December 21, 2001 and January 18, 2002. Transcript, Vol. I at 1, Vol. II at 193. At the outset Stewart described the case as "an appeal from—a partial appeal, I guess, of a complaint investigation report." *Id.*, Vol. I at 3.

15. In his opening argument Herlan stated:

It's not exactly clear to us that [sic] the full range of topics we may touch upon today, but certainly the core question that's going to be on the table is whether the events of last year in some way denied Brian [sic] his right to an appropriate education; and the complaint investigator ruled that it did not. And it is our assumption—although, this is an odd forum with an appeal from a complaint ruling. It would seem at the very least that the burden will be on the family to establish that the complaint

investigator's ruling about FAPE is wrong, and we're assuming that that's the case . . . .

We may hear discussion about whether the school failed to implement modifications that were set forth in Brian's [sic] IEP or whether the school failed to implement particular goals that were in his IEP.

Those are both issues that the complaint investigator said—found that there were errors. You will hear from school personnel adamantly that there were not.

*Id.*, Vol. I at 9–11. After discussing several other issues (including the effectiveness of a Harry Potter English course, failure to mainstream Bryan at lunchtime and lack of educational programming three days a week in the school's first-period block), Herlan summarized:

. . . The school's position is first and foremost that the school has not done anything wrong here in this case; nothing at all. And you don't even get to the question of remedy, but certainly even if you were to look at this and conclude that there were errors made you ultimately end up as the complaint investigator did with the question of whether those errors warrant some kind of remedy, and there you ask whether the student was deprived [of] an appropriate education because of it, and what's an appropriate education?

*Id.*, Vol. I at 17.

16. The following colloquy ensued:

MR. DONLAN: . . . At the prehearing I thought we agreed that both parties agreed that the findings of Ms. Hamrin's report were not going to be challenged. It sounded to me that Mr. Herlan, when he started his opening statement, is now contesting that modifications were implemented vice what Ms. Hamrin found they weren't implemented, and that all

IEP objectives and goals were implemented vice what Mr. [sic] Hamrin found that they weren't implemented. And it appears to me to be contrary to what we agreed to be at the prehearing.

\*      \*      \*      \*      \*      \*

MR. STEWART: ... I think what we did was to try to establish what is at issue here. We agreed that there were some procedural issues and some substantive issues. You went through that list that there were a series of findings that you had made in your prehearing statement which I have here, which you found in the hearing officer's—in the complaint investigator's report that you agreed with, so we didn't press those. There were some that you didn't with [sic] and you were going to go ahead with those. I don't think that the school is introducing anything new. I think that your concerns that you preserved for argument at our prehearing are still preserved, and I think they are not different than the issues that Mr. Herlan was talking about today, I think.

\*      \*      \*      \*      \*      \*

MR. HERLAN: I think Mr. Donlan has a point. I believe in the list of issues that they've left identified, there's no listing about the classroom modifications issue and the goals and objectives issue, and the other points I mentioned I think are all in their listing, but those two are not. And ... Mr. Stewart is going to have to decide how to manage this appeal, but we have not appealed and acknowledged that we have not appealed Jeannie Hamrin's rulings on any of these things, but we are not—we have not entered any stipulations that we in fact violated X or Y. We don't believe we did. We think Jeannie Hamrin got it wrong on all those issues, but we haven't

appealed them, and Peter knows we haven't appealed them. And so I don't know what he'll do about that.

MR. MCINTOSH: [4] I think—I would suggest that what Peter ought to do is bar any testimony that goes to the points that Jeannie Hamrin ruled upon that are not being challenged in this appeal. And the problem is that if the school gets to offer testimony in regard to all those points that we're taking off the table at the prehearing, then we should be able to offer testimony on that too. And without a five day's notice, we're not in a position to revise our witness list and get the other people in here who would testify to all that other stuff. That's not fair.

MR. HERLAN: Well, you say revise your witness list. I think your witness list had one person before anything was taken off the table. But, see, what's odd about this and what makes it interesting and hard—and I'm not—maybe Peter will rule that stuff is irrelevant, but the dilemma is—the core issue that remains on the table is whether the student was denied FAPE. And it's a natural thing in addressing that issue for the school to say we think we implemented the program fully. We have not appealed her rulings, but we also have not stipulated to the correctness of them.

MR. STEWART: Maybe we should go off the record here for just a second...

(An off-the-record discussion was held.)

MR. DONLAN: I agree with Mr. Herlan that we should take an overall

---

4. Mr. McIntosh evidently is Lou McIntosh of Merrywing Corporation, who served as the family's advocate. *See* Record at 1.

look at the IEP effectiveness, and that's what we're going to be looking at today. *Id.*, Vol. I at 21–25.

17. The Donlans called Roxanne Jones and Karen Donlan as witnesses. *Id.*, Vol. I at 26, 113. Terrence Donlan elicited testimony from both concerning implementation of modifications and IEP goals and objectives as well as lack of a behavior plan for Bryan. *See, e.g., id.*, Vol. I at 36–43, 52–55, 60 (Jones testimony), 134–39 (Karen Donlan testimony). During Herlan's cross-examination of Jones, Terrence Donlan objected to a question concerning Bryan's behavior at school, arguing that it had "already been established by the complaint investigator that there was no behavior plan." *Id.*, Vol. I at 100. Herlan responded: "I know. She made a lot of mistakes in that report." *Id.* Stewart observed, "That's just argument and all the parties will have a chance to make the arguments they wish to make based upon the facts." *Id.*, Vol. I at 100–01.

18. During cross-examination of Karen Donlan the following colloquy ensued:

MR. DONLAN: I object. I object. We agreed at the prehearing that the issues that were in the complaint investigator's report—she stated several times, twice, at least, that there was no behavior plan. Now Mr. Herlan is trying to bring that up again. We removed that from our list of issues at the prehearing and now he's bringing it up again that there was a behavior plan, and the complaint investigator has ruled that there was none and the school has not formally debated that so that's a binding stand in there, so we're wasting time here.

MR. HERLAN: We haven't agreed to that; and this just shows how wrong she was.

MR. STEWART: But didn't—just a second. Didn't Roxanne talk about the behavior plan in her testimony?

MR. HERLAN: As did Mrs. Donlan on direct.

MR. STEWART: And wasn't there some discussion about the benefits that would have accrued to Brian [sic] had there been an appropriate behavior plan in place?

MR. DONLAN: Right.

MR. STEWART: Well, I think you put that into issue in this case. I think Mr. Herlan gets a chance to talk about that at this hearing. . . .

MR. DONLAN: Okay. Then I guess I would request to be allowed to amend our witness list and provide additional documentation if that's going to be a point on contention.

MR. STEWART: I think you have the right to put on whatever witnesses you think you're going to need to make your case, but I think that's at issue here. I think you did that. I think that by introducing that testimony on that point he gets to cross-examine your witnesses on that point. I don't see any way to restrict that ability. . . .

MR. DONLAN: Okay.

MR. STEWART: If it takes other witnesses, I guess it takes other witnesses, but that's your—that's yours to decide.

MR. DONLAN: I guess at the prehearing we were under the impression that whatever was in the investigator's report we were not going to debate to save time. It was both sides were going to accept what was in the report. So when we use that out of the report I don't think we're opening it up to new debate. We're just siting [sic] things that were already found by the investigator.

MR. STEWART: My understanding—and I will listen to whatever arguments anybody wants to make about this either now or some later stage of this.

That what we did at the prehearing was to identify the issues that you wanted to establish at the hearing. And I remember specifically that when we came back from the break you started saying to the school—and you agree with this finding. And Mr. Herlan's response was: No. We don't stipulate to any of this stuff. This is not a series of stipulations. It is an attempt to pare down the 40 or 50 paragraphs to some smaller number of issues you wanted to prove. I thought that's what we did.

\* \* \* \* \* \*

MR. STEWART: ... What I tried to say at the beginning of this day was that the points that you needed to prove to make your case you had to submit testimony on, and that's when Mr. McIntosh said, well, we may need more witnesses then. If that's the case, you do. We should get the witnesses on that you need. But you should, it seems to me, approach this case with the idea that if you want me to make a finding on it, you're going to have to put on evidence. The complaint investigation report is in there for this, but it's not binding, I think, on this proceeding. We're not bound by the factual findings there. Okay?

MR. DONLAN: Okay.

*Id.*, Vol. I at 173–77.

19. The Donlans submitted a written closing argument dated January 31, 2002 contending that FAPE was denied on the basis, among other things, of failure to develop a behavior plan and IEP deficiencies (including failure to introduce many IEP goals and objectives). Record at 645, 649, 653–55, 664. In a section titled "Deference to the Findings of Fact in the Complaint Investigation Report" they argued:

The complaint investigator made forty-nine findings of fact, and none of them were challenged by the WOCSD.... The Complaint Investiga-

tor made these findings after extensive conversations and interviews not only with the individuals whom the School presented as witnesses at the hearing, but also with several other individuals ... who did not appear at the hearing. Her findings of fact therefore deserve deferential regard, especially in the utter absence of evidence or testimony to the contrary; indeed, these findings of fact were repeatedly confirmed during the additional testimony received at hearing.

*Id.* at 665.

20. In a post-hearing memorandum, counsel for the School District argued that while a reviewing court usually defers to a hearing officer's factual findings, "here, however, ... the complaint investigator has not heard individuals testify under oath, so the usual justification for deference may not arise here." *Id.* at 960. Counsel argued at some length that, to the extent the complaint investigator found certain violations, she was wrong. *Id.* at 965–79.

21. By decision dated March 5, 2002 Stewart held in favor of the School District. *See generally id.* at 997–1005.

22. Stewart considered, among other things, the standard of review to be applied, observing that both parties testified at hearing that each was dissatisfied with certain aspects of the complaint investigator's report although only the Donlans had appealed it. *Id.* at 1000. He concluded:

Maine law does not specify what standard of review is to be applied in such an appeal, and this hearing officer is unaware of any judicial or administrative authority on this point. This matter was discussed both at the pre-hearing and on the first day of the hearing itself. At that time, the hearing officer ruled that this due process hearing was to be conducted as a *de novo* proceeding, with

the moving party carrying the burden to prove the violations of the IDEA and state special education law asserted in the due process hearing. This hearing has been conducted, and this decision written, on that basis. The burden is upon the moving party, the family, to prove the asserted violations of the IDEA; the hearing officer is not obligated to defer to the findings of fact or conclusions contained in the complaint investigator's report.

*Id.* at 1001.

23. Stewart concluded that the manner in which the School District implemented Bryan's IEP for the school year 2000–01 did not violate the IDEA or Maine special-education law and regulations. *Id.* at 998, 1001–05.

## II. Conclusions of Law

1. Congress enacted the IDEA to ensure that children with disabilities receive a "free appropriate public education," or "FAPE." *See, e.g.,* 20 U.S.C. § 1400(d)(1)(A). FAPE consists of special education and related services that are provided to children with disabilities at public expense and under public supervision during preschool, elementary school and secondary school. *See id.* § 1401(8). The states and "local educational agencies" located within them are responsible for ensuring that children with disabilities receive FAPE. *See, e.g., id.* § 1412–13. In return, those bodies receive funds from the federal government for use in implementing the provisions of the IDEA. *See, e.g., id.* §§ 1412(a), 1413(a).

2. A "pupil evaluation team," or "PET," consisting of a disabled child's parents, teachers, school administrators and others who know the child well oversees the child's special education. *See id.* § 1414(d)(1)(B); MSER § 8. The PET develops, reviews and revises as appropriate an "individualized education plan," or "IEP," outlining the special education ser-

vices the child should receive. *See* 20 U.S.C. §§ 1414(d)(3) & (4)(A).

3. The IDEA affords a disabled child's parents a number of procedural rights intended to ensure their participation in the development of their child's program and placement. *See, e.g., id.* § 1415(b). These include the right to "an impartial due process hearing" with the following safeguards: (i) the right to be accompanied and advised by counsel and by individuals with special knowledge or training concerning children with disabilities, (ii) the right to present evidence and to confront, cross-examine and compel the attendance of witnesses; (iii) the right to a record of the hearing; and (iv) the right to written or electronic findings of fact and decisions. *Id.* §§ 1415(f)(1) & (h).

4. However, "the impartial due process hearing authorized by the [IDEA] are to be conducted in accordance with state law. This principle is limited only where the federal Act and regulations mandate different or more stringent procedural protection on a given point than does state law." *Town of Burlington v. Department of Educ.,* 736 F.2d 773, 781 (1st Cir.1984), *aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (citations and footnote omitted).

5. Maine Special Education Regulations provide parents three options for the resolution of a dispute concerning a child's special education: due-process hearing, complaint or mediation. MSER § 13.2. If resolution via complaint is chosen, the DOE appoints a complaint investigator to (i) carry out an independent on-site investigation if one is determined necessary, (ii) provide the complainant an opportunity to submit oral or written information, (iii) review all relevant information and make a preliminary determination, (iv) hold a complaint resolution meeting, if necessary, to discuss preliminary findings and develop a

proposed resolution, and (iv) transmit a written decision the the DOE addressing each allegation in the complaint. *Id.* § 13.5. The DOE must "review the written decision of the complaint investigator and issue a final and binding decision to the complainant and the respondent." *Id.*

6. Per 20–A M.R.S.A. § 7206(4), "[a] parent or a school administrative unit may challenge a complaint investigation report by requesting a due process hearing within 30 days of the receipt of the complaint investigation report."

7. Per MSER § 13.9, a hearing officer must hold a pre-hearing conference "to consider the simplification or clarification of issues, the limitation of the number of witnesses, the possibility of agreement disposing of all or any of the issues in dispute, and such other matters as may aid in the disposition of the adjudicatory proceeding."

8. Maine law affords parents all due-process-hearing procedural protections outlined in the IDEA plus the following: (i) the right to prohibit the introduction of any evidence at hearing that has not been disclosed at least five business days before the hearing, (ii) the right to have one's child present at the hearing, (iii) the right to open the hearing to the public and (iv) the right to have the hearing conducted at a time and place reasonably convenient to themselves and their child. MSER § 12.11(K).

9. A party dissatisfied with the decision of a DOE hearing officer may appeal that decision to the Maine Superior Court or the United States District Court. 20–A M.R.S.A. § 7207B(2)(B); *see also* 20 U.S.C. § 1415(i)(2)(A).

10. The IDEA provides that a court reviewing the decision of a hearing officer "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the prepon-

derance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B).

■ 11. In such cases, "[t]he role of the district court is to render bounded, independent decisions—bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court." *Hampton Sch. Dist. v. Dobrowolski,* 976 F.2d 48, 52 (1st Cir.1992) (citation and internal quotation marks omitted). "While the court must recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such findings is ultimately left to the discretion of the trial court." *Id.* (citation and internal quotation marks omitted).

■ 12. The burden of proof rests on the party challenging the hearing officer's decision. *Id.* at 54; *see also, e.g., Maine Sch. Admin. Dist. No. 35 v. Mr. and Mrs. R.,* 176 F.Supp.2d 15, 23 (D.Me.2001) ("The party allegedly aggrieved must carry the burden of proving ... that the hearing officer's award was contrary to law or without factual support.").

13. The Donlans contend that Stewart violated their right to a fair and impartial hearing pursuant to 20 U.S.C. § 1415(f)(1) and MSER § 13 by (i) not recognizing that the complaint investigator's findings were binding, (ii) changing the scope of their complaint from a focused partial appeal to a *de novo* proceeding without authority after the pre-hearing and hearing, and (iii) changing the hearing rules during and after the pre-hearing and hearing. Plaintiffs' Brief at 1, 3.

### First Point: Failure To Recognize Complaint Investigator's Findings Were Binding

14. As to the first point, the Donlans note that Dr. Hamrin found in their favor

on three of six issues, and the School District took no appeal. *Id.* at 4. In their view, Stewart was obliged to recognize those issues as "binding," with his failure to do so effectively giving the School District a free appeal victory. *Id.* They argue, in particular, that Stewart's treatment flew in the face of (i) Albanese's description of the Hamrin decision as "final and binding," (ii) the School District's "implicit acknowledgement" (by virtue of its failure to appeal) that the Hamrin decision was binding and (iii) MSER § 13.5, which describes complaint investigators' reports as "final and binding." *Id.* at 4–5. In addition, the Donlans complain that Stewart offered no authority for the proposition that he could disregard Dr. Hamrin's findings and conclusions. *Id.* at 5.

15. This first point implicates two issues: scope of review (*i.e.*, the sweep of issues properly before Stewart) and standard of review (*i.e.*, as to those issues properly in play, the degree of deference to be afforded to the complaint investigator's decision).

16. Turning first to the issue of scope, I find no impropriety in Stewart's handling of the Donlans' case. A complaint investigator's decision inherently is final and binding only to the extent unappealed. *See* 20–A M.R.S.A. § 7206(4). The Donlans appealed. While they appealed only one of Dr. Hamrin's conclusions and the School District appealed none, their single issue (denial of FAPE) was so broad as to intersect with nearly every other one of Dr. Hamrin's findings. *See Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1090 (1st Cir.1993) (IEP must be viewed as "unitary whole" when determining whether student was offered FAPE). They thus (perhaps unwittingly) potentially placed nearly all issues back on the table.

17. Moreover, when directed by Albanese to submit a pre-hearing statement of "the issues each party believes to be involved in this hearing" and "the [f]indings each party expects to emerge from the hearing," Record at 4–5, the Donlans submitted a comprehensive list of thirty-nine findings that they expected the hearing officer to make. In accordance with the dictate of MSER § 13.9 that a hearing officer hold a pre-hearing conference to, among other things, consider "simplification or clarification of issues" and "the possibility of agreement disposing of all or any of the issues in dispute," Stewart held such a conference with the parties in this case. Unfortunately, there is no transcript of the pre-hearing conference; however, it is apparent from the Record that the parties whittled the Donlans' list down. To the extent Stewart considered any item on that pared-down list, it was properly before him.

18. The Donlans, who shoulder the burden of proof on this appeal, identify two instances in which the hearing strayed from the boundaries of the agreed-upon list, involving the issues of (i) failure to implement modifications and IEP objectives and goals and (ii) lack of a behavior plan. Plaintiffs' Brief at 7–9.

19. The Record reveals that the Donlans acquiesced in the placement of the first issue (IEP/modification implementation) on the table. As they point out, *id.* at 7–8, after Herlan alluded to this issue in his opening argument, they promptly objected and Herlan essentially conceded that it was beyond the scope of issues listed. However, that was not the end of the colloquy. Herlan questioned how the parties could address the broad issue of FAPE without considering the manner in which the School District had or had not implemented Bryan's IEP. An off-the-record discussion ensued, after which Terrence Donlan stated on the record, "I agree with Mr. Herlan that we should take

an overall look at the IEP effectiveness, and that's what we're going to be looking at today." Transcript, Vol. I at 25. The Donlans then went on to elicit evidence on this very point. Thus, this point was placed in issue before, and properly considered by, the hearing officer.[5]

20. As to the second "surprise" issue—lack of a behavior plan—the Record indicates that the Donlans themselves brought the issue into play by eliciting evidence on it at hearing. Under the circumstances, Stewart committed no error in ruling that they had opened the door to this issue and, thus, it was properly before him. *See, e.g., Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 39–40 (1st Cir.2002) (although parties had agreed to exclude certain evidence, judge did not abuse discretion in admitting evidence when party that had sought its exclusion "opened the door" to it by eliciting relevant testimony on cross-examination).

21. I turn next to the second sub-issue, standard of review. Dr. Hamrin made findings of fact and conclusions of law. To the extent the Donlans argue that Stewart was obliged to accept Dr. Hamrin's legal conclusions—*i.e.*, that certain facts (say, absence of a behavior plan) constituted a violation of law—they are mistaken. Stewart inherently possessed the power, and shouldered the responsibility, to make independent determinations of law. *See, e.g., Gioiosa v. United States*, 684 F.2d 176, 179 (1st Cir.1982). (" 'De novo determination' can apply only to fact-related matters; a court, at any level, can determine the state of the law.").

22. To the extent the Donlans argue that Stewart was obliged to defer to Dr. Hamrin's factual findings (*e.g.*, that no be-

havior plan existed), I find no relevant authority standing for the proposition that this was so. Critically, as Stewart noted in explaining why he chose to make *de novo* findings, no federal or state statute or regulation specifies the standard by which a hearing officer in a Maine special-education case is to review a complaint investigator's report. Nor is there any caselaw construing 20–A M.R.S.A. § 7206(4), the statute that provides the right of appeal in these circumstances. In short, nothing obliged Stewart to defer to the complaint investigator's factual conclusions. He was free—indeed, compelled—to choose a standard of review. Given the volume of both documentary evidence and testimony he took under oath, his choice to re-examine the facts before him afresh was reasonable. There is no basis for this court to find it to have been a violation of the Donlans' due-process rights.

### Second Point: Changing Scope of Appeal

23. The Donlans next contend that, although Stewart and even the School District recognized at the outset of the hearing that they had taken a "partial" appeal implicating "certain violations found by the investigator," Stewart evidently forgot this when preparing his report. Plaintiff's Brief at 5–6. In the Donlans' view, Stewart "should have framed the scope of the hearing as follows: we have these three binding findings of violations of MSER; I will rule on MDOE Complaint 01.264 based on these binding findings and the additional information/arguments made on the specific issue of denial of FAPE cited in the Complaint." *Id.* at 5. Further, the Donlans contend that during the pre-hear-

---

5. In their reply brief, the Donlans essentially acknowledge that this issue was on the table. Plaintiffs' Reply to Defendant's Response Brief (Docket No. 14) at 5. However, they contend that it should have been reviewed in

the context of the "binding" Hamrin report, with the three findings against the School District taken as "givens." *Id.* The latter argument is addressed below.

ing and hearing Stewart never uttered the words *"de novo,"* that it is difficult to understand how he ruled that the hearing was to be conducted as a *de novo* proceeding without using that phrase once in three days, and that Stewart neither had, nor cited to, authority permitting him to conduct a *de novo* proceeding. *Id.* at 5–7.

■ 24. This second overarching point again implements scope and standard of review. As to scope, I find no evidence that Stewart impermissibly altered the boundaries of issues under review. As explained above, the Donlans themselves were asked to identify the issues for adjudication. They did so, and the parties pared the list down. To the extent new (*i.e.,* non-listed) issues arose during hearing, the Donlans themselves acquiesced in, or opened the door to, their introduction. Nothing in Stewart's final report strays from the confines of the evidence taken at hearing.

25. As to standard of review, the Donlans' arguments betray a mistaken belief that they could place an issue on the table before the hearing officer and yet preserve its status as a "final and binding" adjudication by the complaint investigator. One cannot have it both ways. Once an issue is placed into the hopper of an appeal, it is revived as a "live" issue. A separate question then arises as to the degree (if any) to which the new adjudicator should defer to the factual findings of the old. As explained above, on this point the law provided no clear answer, and Stewart made a reasonable choice.[6]

26. The Donlans' argument that Stewart failed to apprise them that the proceeding would be handled *de novo* likewise falls short. As an initial matter, there is

no evidence of record concerning what was said at the pre-hearing other than Stewart's observation in his decision that the matter was discussed at that time. Stewart also stated in his decision that he ruled on the first day of hearing that the matter would be considered *de novo*. While the phrase *"de novo"* does not appear in the hearing transcript, the Record corroborates that Stewart gave the Donlans clear warning that he intended to consider the issues before him afresh on appeal. *See* Transcript, Vol. I at 177 ("But you should, it seems to me, approach this case with the idea that if you want me to make a finding on it, you're going to have to put on evidence. The complaint investigation report is in there for this, but it's not binding, I think, on this proceeding. We're not bound by the factual findings there. Okay?").

**Third Point: Changing Hearing Rules**

27. As a final matter, the Donlans argue that Stewart changed the hearing rules during and after the pre-hearing and the hearing. Plaintiffs' Brief at 7–10. They posit that Stewart (i) permitted testimony on issues not on the agreed-upon list, (ii) failed to make a clear ruling on the treatment of Dr. Hamrin's report (despite even Herlan's cues that he needed to do so), (iii) vaguely managed the hearing process, making it impossible for them to have a fair and impartial hearing, and (iv) failed to apprise them of "the significant transition" from partial appeal to *de novo* review. *Id.*

■ 28. Stewart did not unilaterally modify the hearing rules. As discussed above, to the extent he permitted testimony on "new" matters, the Donlans either

---

**6.** The Donlans append to their brief a copy of a due-process hearing report in which, in their view, a partial appeal was properly handled. *See* Plaintiffs' Brief at 6; *Parents v. Penobscot,* Case Nos. 01.071 & 01.073 (Me. Dep't of Educ. Apr. 11, 2001), attached thereto. However, as to the issues before her, the hearing officer evidently conducted a *de novo* review. *See generally Penobscot.*

**274**

acquiesced in its introduction or introduced it themselves.

29. Nor did Stewart fail to make a clear ruling. First, there is no evidence of record that he ever told the Donlans that, as to issues placed before him, the Hamrin report would be considered binding. In fact, toward the end of the first day of hearing, Stewart informed the Donlans of the converse: that he did not consider himself bound by the Hamrin report and, to the extent they wanted him to rule on an issue, they would have to adduce evidence on the point.[7] The Donlans, whom the Record makes manifest are intelligent and able advocates for themselves and their son, voiced no protest or confusion, instead responding, "Okay." Transcript, Vol. I at 177.

30. The Donlans offer as an example of Stewart's vague management of he hearing process his statement that: "I think that your [the Donlans'] concerns that you preserved for argument at our prehearing are still preserved, and I think they are not different than the issues that Mr. Herlan was talking about today, I think ...." Plaintiffs' Brief at 8. The Donlans argue that in so stating, Stewart confusingly implied that Dr. Hamrin's report was still binding but that the door was open for the School District to debate issues previously decided. I disagree. While it is not clear what concerns the Donlans preserved at prehearing, the import of the statement is that Herlan had not raised any issue beyond the scope of those agreed to by the parties at pre-hearing. Assuming *arguendo* that "vague management" could deprive a party of his or her right to a fair and impartial IDEA hearing, no such deprivation is shown in this case.

31. Nor did Stewart fail to apprise the Donlans of a "significant transition" from a partial appeal to a *de novo* proceeding. Indeed, there was no such transition. The Donlans themselves identified multiple ways in which Bryan was allegedly denied FAPE, placing those issues in play at hearing. In addressing those issues, Stewart was not obliged to defer to Dr. Hamrin's findings, and he informed the Donlans that he did not intend to do so.

### III. Conclusion

For the foregoing reasons, the Donlans fail to establish any violation of their right to a fair and impartial hearing pursuant to 20 U.S.C. § 1415(f)(1) and MSER § 13. Their appeal accordingly is **DENIED**.

---

7. Moreover, Stewart did not restrict the Donlans in putting in evidence; to the contrary, he expressed willingness to hear whatever witnesses they needed to make their case.