Alejandra **LOPEZ**, Parent and Friend of C.C., a Minor, Plaintiff,

v.

**DISTRICT OF COLUMBIA, Defendant.**

**No. CIV.A. 03–1665(JMF).**

United States District Court, District of Columbia.

Jan. 26, 2005.

Matthew B. Bogin, Futrovsky, Nitkin & Scherr, Chartered, Rockville, MD, Rebekah Antoni Gleason, Good Shepherd Legal Services, Washington, DC, for Plaintiff.

Eden Ilene Miller, Office of the Corporation Counsel, Washington, DC, for Defendant.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

Plaintiff brings this action to challenge a decision by the District of Columbia Public Schools ("DCPS") to place a learning disabled student at Prospect Learning Center ("Prospect"), a public school program, and a hearing officer's approval of that placement. Both plaintiff and defendant have filed *Motions for Summary Judgment* that are ripe and ready for resolution. Plaintiff has also filed a second *Motion for Preliminary Injunction,* which is ripe for consideration. In essence, plaintiff maintains that DCPS has denied her daughter a free, appropriate public education ("FAPE") by proposing Prospect as a placement. Plaintiff also argues that, by providing funding and transportation to

Accotink Academy ("Accotink"), a private institution, DCPS has made a *de facto* placement there. For the reasons stated herein, plaintiff's *Motion for Summary Judgment* is granted in part and denied in part; defendant's *Motion for Summary Judgment* is granted in part and denied in part; and plaintiff's *Motion for Preliminary Injunction* is denied.

## I. BACKGROUND

C.C., the minor plaintiff, is a thirteen-year-old disabled student. On May 22, 2003, a bilingual multi-disciplinary team ("MDT") convened to review C.C.'s educational needs. The team determined that C.C. was eligible to receive special education services and created an Individualized Educational Program ("IEP") for her.

On the cover page of the IEP, there is a summary of special education and related services to be provided to C.C. This summary lists: (1) specialized instruction, 25 hours per week; (2) psychological services, 45 minutes per week, and (3) speech-language services, 45 minutes per week. IEP, Administrative Record ("AR") at 14. Elsewhere in the IEP, there are notations regarding C.C.'s strengths and weaknesses in various academic, social, and behavioral areas. The IEP also includes short-term and annual goals that the team set for C.C.

According to the MDT meeting notes, after reviewing various evaluations of C.C., the team made the following recommendations:

1. Consultation to monitor stuttering;
2. Specialized instruction to address academic delays;
3. Counseling to address social-emotional concerns;
4. Referral to pediatrician for medication to address ADHD;
5. Family should seek outside family counseling for parent support.

MDT Continuation Meeting Notes, AR at 32. However, neither the IEP nor the meeting notes contain any recommendations regarding specific reading programs or behavior modification plans that would be appropriate for C.C.

During the MDT meeting, DCPS decided that Prospect Learning Center ("Prospect"), a public school program, was an appropriate placement for C.C. Dissatisfied with that placement, C.C.'s mother requested a due process hearing. On June 25, 2003, a hearing was held, and the hearing officer found that DCPS' placement recommendation was appropriate. Still dissatisfied, C.C.'s mother filed the instant action.

When the school year began on September 2, 2003, despite DCPS' proposed placement at Prospect and plaintiff's knowledge of the instant, pending lawsuit, C.C. began attending Accotink, a private school that her sister attends. Plaintiff explains that C.C. began attending Accotink because she had not received any information regarding Prospect, the personnel at Prospect had no knowledge of C.C., DCPS failed to send transportation to Prospect, and Accotink-not Prospect-was the only school with which plaintiff was familiar.

After the school year began, there were two communications that added to the confusion. On September 29, 2003, the principal of Prospect sent plaintiff a letter-written in English-explaining that DCPS had reserved a spot for C.C. at Prospect but that, if she did not report for registration and enrollment by October 6, 2003, another student would receive her slot. On October 8, 2003, DCPS sent a letter to Accotink naming C.C. as a newly funded student who needed to complete a residency verification process. Plaintiff completed the process and inquired as to why C.C. was not receiving transportation to Accotink if she was a funded student. DCPS began providing transportation to Accotink shortly thereafter.

In early 2004, DCPS discovered that it had made several clerical errors and that it had been funding C.C.'s tuition and transporting C.C. to Accotink mistakenly. On February 19, 2004, in a letter to plaintiff, DCPS stated that C.C.'s proper placement was at Prospect. DCPS also issued a change in transportation form, ending transportation to Accotink and providing transportation to Prospect.

On April 26, 2004, this court granted plaintiff's first *Motion for a Preliminary Injunction,* and the District of Columbia was ordered to transport and fund C.C.'s education at Accotink for the remainder of the academic year. However, the court deferred ruling on whether Accotink was the proper or a *de facto* placement for C.C. and whether the District could seek reimbursement from plaintiff until both parties' motions for summary judgment had been fully briefed.

The motions are now ripe for consideration, and it appears from the pleadings that there are two distinct issues for the court to decide: (1) whether, given the contents of C.C.'s IEP, Prospect is an appropriate placement for her, and (2) whether, because the District funded and transported C.C. to Accotink for a large part of the 2003–2004 school year (prior to the April 26, 2004 court order), the District is estopped from arguing that it should not be required to pay for the educational services C.C. received while at Accotink.

## II. DISCUSSION

### A. Whether Prospect Is an Appropriate Placement for C.C.

#### 1. Legal Standard

The Individuals with Disabilities Education Act ("IDEA" or "Act") guarantees children with disabilities the right to a free appropriate public education ("FAPE") with services designed to meet their unique needs. 20 U.S.C. §§ 1400(d)(1)(A); 1412(a)(1). The primary vehicle for ensuring that students identified as disabled receive FAPE is the creation and implementation of an IEP that sets forth the disabled child's educational needs and the services that will be provided to meet those needs. *School Committee of Burlington v. Dept. of Education of Massachusetts,* 471 U.S. 359, 368, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (describing the IEP as the *modus operandi* of the IDEA); 20 U.S.C. § 1414(d)(1)(A). The child's parents, teachers, school officials, and other professionals collaborate to develop the IEP and recommend a placement for the child. 20 U.S.C. § 1414(d)(1)(B). If a parent is dissatisfied with the IEP, he or she may seek revisions or request a due process hearing. 20 U.S.C. §§ 1415(b)(6); 1415(f)(1).

Once a hearing is held and an administrative determination is made, a party may appeal the decision of the hearing officer. 20 U.S.C. §§ 1415(i)(1)(A); 1415(i)(2)(A). The IDEA specifically provides that

> any party aggrieved by the findings and decision under this subsection, shall have the right to bring a civil action *with respect to the complaint presented* pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.

20 U.S.C. § 1415(i)(2)(A) (emphasis added). The IDEA further requires that the reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B).

Courts have interpreted the Act's requirement that a reviewing court "receive the records of the administrative proceed-

ing" as requiring courts to give "due weight" to the hearing officer's determinations. *Bd. of Educ. of Hendrick Hudson Sch. Dist. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *Leonard v. McKenzie,* 869 F.2d 1558, 1561 (D.C.Cir.1989); *Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C.Cir.1988); *Shaw v. District of Columbia,* 238 F.Supp.2d 127, 134 (D.D.C.2002). In addition, the "party challenging the administrative determination bears the burden of persuading the court that the hearing officer was wrong...." *Kerkam,* 862 F.2d at 887. In resolving the dispute, the court must always be mindful that it is not the court's role to "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034.

### 2. Analysis

█ First, it is important to note that plaintiff has not objected to or complained about the MDT meeting itself, nor has she identified any procedural violations that have denied C.C. access to FAPE. Nor has plaintiff objected to the substantive content of C.C.'s IEP. Rather, at the conclusion of the MDT meeting and at the due process hearing, plaintiff objected to C.C.'s IEP solely on the basis of DCPS' proposed placement at Prospect. Accordingly, the only issue before the court is that which plaintiff raised below-whether Prospect can implement the services listed on C.C.'s IEP. *See* 20 U.S.C. § 1415(i)(2)(A) (stating that a party aggrieved by a hearing officer's decision may bring a civil action *with respect to the complaint presented* pursuant to this section) (emphasis added).

Plaintiff explicitly concedes that she is only challenging DCPS' placement decision, not the substantive content of the IEP. Hearing Tr. at 3. In the same breath, however, plaintiff has repeatedly emphasized that, in order to receive FAPE, C.C. needs specific services, such as a systematic research-based reading program, a positively oriented behavior modification plan, and a certified reading specialist to aid her with her reading in the classroom. These services were listed nowhere in the IEP or in the meeting notes but did appear in a report written by Dr. Susanna Hughes, a psychologist who evaluated C.C. Plaintiff claims that the team discussed these services at the MDT meeting and that these specific services constitute the specialized instruction, psychological services, and speech-language services identified in the IEP. Accordingly, plaintiff insists that, because Prospect cannot provide these specialized services, Prospect is an inadequate placement for C.C.

Thus, it is clear that plaintiff and defendant's fundamental disagreement revolves around what the IEP requires, and thus they disagree as to whether Prospect can implement the services required by the IEP. Unfortunately for plaintiff, although it addresses C.C.'s academic strengths and weaknesses and sets annual goals for C.C., the IEP is utterly devoid of mentioning-let alone requiring-the specific programs, methodologies, or instructional tools that plaintiff insists would benefit C.C. educationally.

Moreover, even if, after reviewing all of C.C.'s evaluations and records, the MDT team determined that a specific reading program, behavior modification plan, or other accommodation was appropriate for C.C., it would have to be included in the IEP. The Code of Federal Regulations states:

> If ... the IEP team determines that a child needs a particular device or service (including an intervention, accommodation, or other program modification) in order for the child to receive FAPE, the IEP team *must* include a statement to that effect in the child's IEP.

34 C.F.R. § 300.346(c) (emphasis added). Thus, the law requires that any specific program that the team finds necessary for a learning disabled child must be included in the IEP. Because the IEP did not include any specific services, however, the question to be determined is rather simple: can Prospect implement the services listed on C.C.'s IEP?

■ After reviewing five documents[1] and the testimony of five witnesses,[2] the Hearing Officer determined that Prospect could implement the services on C.C.'s IEP and thus upheld DCPS' placement decision. Plaintiff argues that the Hearing Officer erred in making this decision because he relied on the testimony of two witnesses who did not have the requisite knowledge about C.C. and her IEP.[3] Plaintiff attacks the Hearing Officer's finding that Dr. Peterson, the principal of Prospect, had reviewed C.C.'s IEP and determined that it could be implemented at Prospect because Dr. Peterson had never met C.C., nor had she reviewed any of C.C.'s records. Plaintiff also claims that the Hearing Officer erroneously relied on the testimony of Ms. Lawrence, the special education coordinator at the school in which the meeting was held, because she was only present at the IEP meeting for a short while and, while she was present, she did not understand what was being said because the meeting was conducted in Spanish.

As defendant explains, Dr. Peterson and Ms. Lawrence were called for specific purposes, and their testimony must be considered in light of those purposes as well as the documentary evidence that was introduced at the hearing. Ms. Lawrence spoke to the technical aspects of the MDT meeting, which she coordinated, and how she ensured that the IEP was based on the team's review of C.C.'s evaluations and records. She also testified that the services that the team determined to be necessary for C.C. appear on the face of the IEP. Hearing Tr. at 49. As for Dr. Peterson, although she was not a participant in the IEP/MDT meeting, she clearly attested to Prospect's ability to implement C.C.'s IEP and its requirements for specialized instruction, psychological counseling, and speech and language services. Hearing Tr. at 22. Although she had not

1. The five documents were: 1) the Due Process Request dated May 28, 2003, 2) the Individualized Education Program dated May 22, 2003, 3) the Neuropsychological Examination dated March 5, 2003, 4) the MDT Meeting Notes dated May 22, 2003, and 5) the Acceptance Letter to Accotink, dated March 7, 2003.

2. The five witnesses were: 1) Psychologist Susannah Hughes, 2) Mother Alejandra Lopez, 3) Assistant Education Director of Accotink Ann Warnke, 4) Principal of Prospect Eve Peterson, and 5) Special Education Coordinator Dorcus Lawrence.

3. In contrast, plaintiff points out that she not only introduced documentary evidence but also put on testimony from witnesses who knew C.C. personally. These witnesses were also knowledgeable about the placements proposed by DCPS and plaintiff.

While plaintiff's witnesses certainly demonstrated that they knew C.C. and were familiar with her academic history and deficiencies, their testimony focused on C.C.'s educational needs and the substance of the IEP, not the appropriateness of the placement as it related to the services listed on the IEP. As the Hearing Officer stated at the due process hearing, "it seems as if in a way we're revisiting the IEP." Hearing Tr. at 66. Unfortunately for plaintiff, the time to address these issues and insist that C.C. be provided these services was at the MDT meeting when a team was assembled to formulate an educational program individualized to C.C.'s needs. The content of the IEP was simply not the subject of the due process hearing, and this testimony had little relevance to the question presented at the hearing and to this court.

seen the IEP, Dr. Peterson learned of the services required by the IEP through defense counsel's questioning, and she was therefore able to indicate that Prospect could implement those services. While it is disturbing that defendant did not even bother to present one of its most important witnesses with the IEP before-or even at-the hearing, Dr. Peterson learned the services that were required for C.C., and she testified that Prospect could provide them. Not one witness rebutted this testimony. Given this record, it is impossible to conclude that the hearing officer erred in his finding that Prospect can implement C.C.'s IEP.

Again, the real problem lies not in Dr. Peterson's or Ms. Lawrence's familiarity with C.C. and not with Prospect's ability to provide the services on C.C.'s IEP: the real problem is whether an IEP that requires services explained in such general terms is sufficient to provide C.C. a free appropriate public education. As indicated above, however, these were not the questions before the hearing officer, and they are not the questions before the court. Rather, these questions reside with lawmakers, educational policymakers, and MDT teams charged with the task of creating IEPs that identify the services learning disabled students need.

I should also note that, although I am holding plaintiff to the objections she made during the MDT meeting and at the due process hearing, I do not believe that exhaustion of administrative remedies should be applied woodenly. This case involves a child, not an FCC license. Yet even a child cannot expect to take one position, have DCPS make a placement based on it, and then insist that the placement was wrong because it was based on a mistaken premise-that the IEP was sufficient-when the child's parent and lawyer not only participated in the meeting devoted to the creation of the IEP, but they also accepted the IEP's contents.

Moreover, even if plaintiff could now argue that C.C.'s IEP does not include the specific services necessary to provide C.C. with a FAPE, that argument could not carry the day. It must be recalled that Dr. Hughes' assertion that the FAPE had to contain, for example, a specific reading program, does not mean that the IEP was deficient because it did not. An IEP need not conform to a parent's wishes in order to be sufficient or appropriate. *Shaw v. District of Columbia*, 238 F.Supp.2d 127, 139 (D.D.C.2002) (stating that the IDEA does not provide for an "education ... designed according to the parent's desires" and citing *Bd. of Educ. Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). By the same token, an IEP that did not meet any of C.C.'s needs could not possibly survive judicial review. The IEP in this case, however, certainly does not fall into the category of being utterly deficient because it provides C.C. with full-time special education services as well as specialized instruction, psychological services, and speech-language services. Whether those services are adequate to meet C.C.'s needs can only be tested by the IEP's implementation at Prospect and that, of course, has never occurred.

**B. Whether Equitable Principles Prevent DCPS From Refusing to Pay for the Educational Services Provided by Accotink**

■ It is well settled that, if a court ultimately concludes that an IEP recommending placement in a public school was inappropriate and that a private placement sought by the child's parents was proper, the court may order the school district to reimburse parents for the costs of private education, even if the parents placed the

child in the private school before such a judicial determination is made. *Burlington,* 471 U.S. at 369–73, 105 S.Ct. 1996; *Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 10–11, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); *Schoenbach v. District of Columbia,* 309 F.Supp.2d 71, 83–84 (D.D.C.2004); *Scorah v. District of Columbia,* 322 F.Supp.2d 12, 20–21 (D.D.C.2004); 34 C.F.R. § 300.403(c). It bears emphasis that, in order to award such reimbursement, two determinations must be made: 1) the public school program proposed in the IEP was inappropriate, and 2) the private school program selected by the parents was proper. In this case, I have found that the public placement (Prospect) was appropriate. Thus, under normal circumstances, DCPS would have had no obligation to reimburse plaintiff for the costs incurred in sending C.C. to Accotink during the 2003–2004 or 2004–2005 school years.

However, sixteen months have passed since DCPS was required to implement C.C.'s first IEP, and, as recited above, C.C. has attended Accotink, not Prospect, during the pendency of her appeal. Unfortunately, judicial review cannot keep pace with the education of a child, and while I wish that it were the fall of 2003, I cannot make it so. Thus, I must evaluate C.C.'s educational placement, and the responsibility for funding it, in light of what has actually happened over the past year and a half.

A review of the record reveals the following. During 2002–2003, C.C. attended the Children's Studio Public Charter School. In the fall of 2003, however, it was clear that C.C. would not "stay put" at this school because her May 2003 IEP indicated that she was a learning disabled student in need of full-time special education services, and the Children's Studio was not even considered as an appropriate placement. The only schools contemplated

for C.C. to attend during 2003–2004 were: 1) Prospect, the school proposed in the challenged IEP, or 2) Accotink, the school that C.C.'s mother wanted her to attend.

Despite DCPS' proposed placement at Prospect, a hearing officer's determination to uphold that placement, and the filing of the instant district court action challenging that decision, in September of 2003, plaintiff sent C.C. to Accotink. In doing so, DCPS maintains that plaintiff violated 20 U.S.C. § 1415(j), which provides:

> [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j). According to defendant, plaintiff's failure to comply with this "stay-put" provision and her seemingly unilateral decision to place C.C. at Prospect indicate that plaintiff did so at her own financial risk.

This court agrees that, under ordinary circumstances, C.C. would have been required to "stay put" in her "then-current educational placement" during the pendency of these proceedings. *See* 20 U.S.C. 1415(j). However, determining which school was C.C.'s "then-current educational placement" in the fall of 2003 is not as straightforward as it may seem.

According to DCPS, Prospect was C.C.'s "then-current educational placement" in the fall of 2003 because it was the school identified in her IEP and upheld by the hearing officer. In *Burlington v. Massachusetts,* the Supreme Court did not resolve the question of what a disabled child's "then-current educational place-

ment" was when the school district and the parents had agreed that the child needed to attend a new school. However, the Court assumed that the child's "then-current educational placement" was the school proposed in the IEP. *Burlington*, 471 U.S. at 371, 105 S.Ct. 1996.

Assuming that Prospect was C.C.'s then-current educational placement, it would follow that, in September 2003, plaintiff placed C.C. at Accotink at her own financial risk. However, to stop the analysis at this point would be to ignore DCPS' repeated mistakes during the fall and winter of 2003–2004, all of which led plaintiff to reasonably believe that C.C. was attending Accotink at the District's expense.

Thus, rather than focusing on C.C.'s then-current educational placement in the fall of 2003 and whether C.C.'s mother violated the stay-put provision when she placed her child at Accotink, this court finds it necessary to exercise the equitable powers enumerated in the IDEA and determine the relief it deems appropriate under the circumstances. *See* 20 U.S.C. § 1415(i)(2)(B). In doing so, this court notes that the statute's grant of power confers broad discretion on the court. *Burlington*, 471 U.S. at 370–74, 105 S.Ct. 1996.

In weighing the equities, it must be noted that some factors weigh in DCPS' favor, and others weigh in plaintiff's favor. On the one hand, plaintiff sent C.C. to Accotink *before* any of the confusing communications occurred and *while* the instant action, seeking a change of placement to Accotink, was pending. Accordingly, it is difficult to conclude that equity resides with plaintiff when she sent her child to Accotink under these circumstances, even if she did so with the best of intentions. In addition, when asked about her objection to Prospect, plaintiff herself did not identify any educational deficiency in the special education programs there. Rather,

she disliked the fact that Prospect is in a poor neighborhood and that DCPS' programs are generally poor. Tr. at 56–57. These statements suggest that plaintiff would have objected to *any* DCPS program, regardless of its ability to implement C.C.'s IEP, and that she would have placed C.C. at Accotink regardless of DCPS' clerical errors simply to avoid sending her daughter to Prospect.

On the other hand, the court is also mindful of the fact that, one month after school began, the principal of Prospect sent plaintiff a letter-written in English-explaining that DCPS had reserved a spot for C.C. at Prospect but that, if she did not report for registration and enrollment by October 6, 2003, another student would receive her slot. On October 8, 2003, DCPS sent a letter to Accotink naming C.C. as a newly funded student who needed to complete a residency verification process. Plaintiff completed the process and, after she inquired as to why C.C. was not receiving transportation to Accotink if she was a funded student, DCPS began providing transportation to Accotink. Therefore, as of October 2003, plaintiff had every reason to believe that Accotink was the school that C.C. was supposed to attend because DCPS was paying her tuition and providing her transportation.

It also bears emphasis that DCPS' mistakes did not end in early 2004 when it determined that it had been paying for C.C.'s tuition at Accotink mistakenly. In March 2004, although DCPS was invited to participate, DCPS failed to attend an IEP meeting held at Accotink. Under the regulations implementing the IDEA, if a child attends private school because her parents placed her there, the school district is relieved of its obligation to review the child's IEP annually. *See* 34 C.F.R. § 300.341. However, DCPS should have fulfilled its obligation to annually review C.C.'s IEP

during the pendency of these proceedings. *See Town of Burlington v. Dep't of Educ. for Com.*, 736 F.2d 773, 794 (1st Cir.1984) (stating that the federal statute does not address whether IEPs are to be revised during the pendency of review, and fashioning a rule that, pending review of an earlier IEP, local educational agencies should continue to review and revise IEPs). Its failure to do so demonstrates yet another error in a series of transgressions that, in cumulation, have harmed an innocent, learning disabled child.

Finally, in weighing the equities, this court also acknowledges that, on April 26, 2004, it granted plaintiff's first *Motion for a Preliminary Injunction,* and the District of Columbia was ordered to transport and fund C.C.'s education at Accotink for the remainder of the academic year. While this court also deferred ruling on whether Prospect was the appropriate placement and whether DCPS could seek reimbursement for tuition payments, as of April 2004, it was reasonable for plaintiff to believe that the court would ultimately find in her favor.

After weighing all of these factors, this court concludes that the only equitable resolution is to order DCPS to fund C.C.'s attendance at Accotink Academy during the 2003–2004 school year. To do otherwise would be to reward DCPS for its prejudicial errors and to make an innocent child suffer as a result.

■ However, the equitable relief ends there, and I will not order DCPS to fund C.C.'s private education for the 2004–2005 school year. In the summer and fall of 2004, plaintiff was well aware of the controversy surrounding her child's attendance at Accotink, as well as the April 26, 2004 order that C.C. be allowed to remain at Accotink until the end of the 2003–2004 school year. Accordingly, plaintiff's decision to enroll C.C. at Accotink during 2004–2005–and Accotink's decision to ac-

cept her-were at their own financial risk. Given this court's finding that Prospect was an appropriate placement based on C.C.'s IEP, and given the fact that C.C. was no longer in danger of a mid-year transfer, C.C. should have enrolled at Prospect in the fall of 2004, and DCPS cannot be ordered to fund her private education during the 2004–2005 school year.

Finally, while I regret that we again face a situation in which C.C.'s educational placement is being decided in the middle of the school year, I must note that whether C.C. remains at Accotink during the remainder of the 2004–2005 school year is a decision that can be made only by C.C., her mother, and Accotink. In doing so, they must weigh the social, emotional, and academic costs of a mid-year transfer against the financial costs of maintaining C.C. at Accotink because I will not order DCPS to pay for C.C.'s private tuition for the 2004–2005 school year. However, I will remind DCPS that, during the spring of 2005, it shall conduct a meeting to review C.C.'s current IEP in light of the progress she may have made over the past year and a half at Accotink.

An Order accompanies this Memorandum Opinion.

### ORDER

In accordance with the accompanying Memorandum Opinion, it is, hereby, **ORDERED** that:

1. Plaintiff's *Motion for Summary Judgment* [# 15] is **GRANTED in part and DENIED in part**; and it is further **ORDERED** that

2. Defendant's *Motion for Summary Judgment* [# 32] is **GRANTED in part and DENIED in part**; and it is further **ORDERED** that

3. Plaintiff's *Motion for Preliminary Injunction* [# 40] is **DENIED**; and it is further **ORDERED** that

4. *Consent Motion to Consolidate Preliminary Injunction with Hearing on the Merits* [# 43] is **DENIED as moot**; and it is further **ORDERED** that

5. The defendant fund C.C.'s attendance at Accotink Academy during the 2003–2004 school year; and it is further **ORDERED** that

6. During the spring of 2005, the defendant shall conduct a meeting to review C.C.'s current IEP in light of the progress she may have made over the past year and a half at Accotink Academy.

**SO ORDERED.**