Justice Souter,
with whom Justice Scalia and Justice Thomas join, dissenting.
I respectfully dissent.
School Comm. of Burlington v. Department of Ed. of Mass., 471 U. S. 359 (1985), held that the Education of the Handicapped Act, 84 Stat. 175, now known as the Individuals with Disabilities Education Act (IDEA or Act), 20 U. S. C. § 1400 et seq., authorized a district court to order reimbursement of private school tuition and expenses to parents who took their disabled child from public school because the school’s special education services did not meet the child’s needs. We said that, for want of any specific limitation, this remedy was within the general authorization for courts to award “such relief as [they] determine] is appropriate.” § 1415(e)(2) (1982 ed.) (now codified at § 1415(i)(2)(C)(iii) (2006 ed.)). In 1997, however, Congress amended the IDEA with a number of provisions explicitly addressing the issue of *250 “[p]ayment for education of children enrolled in private schools without consent of or referral by the public agency.” § 1412(a)(10)(C). These amendments generally prohibit reimbursement if the school district made a “free appropriate public education” (FAPE) available, § 1412(a)(10)(C)(i), and if they are to have any effect, there is no exception except by agreement, § 1412(a)(10)(B), or for a student who previously received special education services that were inadequate, § 1412(a)(10)(C)(ii).
The majority says otherwise and holds that § 1412(a) (10)(C)(ii) places no limit on reimbursements for private tuition. The Court does not find the provision clear enough to affect the rule in Burlington, and it does not believe Congress meant to limit public reimbursement for unilaterally incurred private school tuition. But there is no authority for a heightened standard before Congress can alter a prior judicial interpretation of a statute, and the assessment of congressional policy aims falls short of trumping what seems to me to be the clear limitation imposed by § 1412(a)(10)(C)(ii).
I
In Burlington, parents of a child with a learning disability tried for over eight years to work out a satisfactory individualized education plan (IEP) for their son. 471 U. S., at 361-362. They eventually gave up and sent the boy to a private school for disabled children, id., at 362, and we took the ensuing case to decide whether the Education of the Handicapped Act authorized courts to order reimbursement for private special education “if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act,” id., at 369. After noting various sections that “emphasiz[e] the participation of the parents in developing the child’s [public] educational program,” id., at 368, we inferred that the Act authorized reimbursement by providing that a district court shall “‘grant such relief as [it] determines is appropriate,’” id., at 369 (quoting what is now *251 § 1415(i)(2)(C)(iii); alteration in original). We emphasized that the Act did not speak specifically to the issue of reimbursement, and held that “[a]bsent other reference,” reimbursement for private tuition and expenses would be an “ ‘appropriate’ ” remedy in light of the purposes of the Act. Id., at 369-370. In short, we read the general provision for ordering equitable remedies in § 1415(i)(2)(C)(iii) as authorizing a reimbursement order, in large part because Congress had not spoken more specifically to the issue.
But Congress did speak explicitly when it amended the IDEA in 1997. It first said that whenever the State or a local educational agency refers a student to private special education, the bill is a public expense. See 20 U. S. C. § 1412(a)(10)(B). It then included several clauses addressing “[p]ayment for education of children enrolled in private schools without consent of or referral by the public agency.” § 1412(a)(10)(C). The first contrasts with the provision covering an agency referral:
“(i) In general
“ ... this subchapter does not require a local educational agency to pay for the cost of education ... of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.” § 1412(a)(10)(C).
The second clause covers the case in which the school authority failed to make a FAPE available in its schools. It does not, however, provide simply that the authority must pay in this case, no matter what. Instead it provides this:
“(ii) Reimbursement for private school placement
“If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, *252 a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.” Ibid.
Two additional clauses spell out in some detail various facts upon which the reimbursement described in clause (ii) may be “reduced or denied.” See §§ 1412(a)(10)(C)(iii) and (iv).
As a purely semantic matter, these provisions are ambiguous in their silence about the case with no previous special education services and no FAPE available. As the majority suggests, ante, at 241-242, clause (i) could theoretically be understood to imply that reimbursement may be ordered whenever a school district fails to provide a FAPE, and clause (ii) could be read as merely taking care to mention one of a variety of circumstances in which such reimbursement is permitted. But this is overstretching. When permissive language covers a special case, the natural sense of it is taken to prohibit what it fails to authorize. When a mother tells a boy that he may go out and play after his homework is done, he knows what she means.
So does anyone who reads the authorization of a reimbursement order in the case of “a child with a disability, who previously received special education and related services under the authority of a public agency.” § 1412(a)(10)(C)(ii).[1] If the mother did not mean that the homework had to be done, why did she mention it at all, and if Congress did not *253 mean to restrict reimbursement authority by reference to previous receipt of services, why did it even raise the subject? “[0]ne of the most basic interpretive canons [is] that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . Corley v. United States, 556 U. S. 303, 314 (2009) (internal quotation marks omitted). But not on the Court’s reading, under which clause (ii) does nothing but describe a particular subset of cases subject to remedial authority already given to courts by § 1415(i)(2)(C)(iii) and recognized in Burlington: a court may order reimbursement for a child who previously received special education related services, but it may do this for any other child, too.[2] But this is just not plausible, the notion that Congress added a new provision to the IDEA entitled “Reimbursement for private school placement” that had no effect whatsoever on reimbursement for private school placement. I would read clause (i) as written on the assumption that the school authorities can be expected to honor their obligations and as stating the general rule that unilateral placement cannot be reimbursed. See § 1412(a)(10)(C)(i) (“In general... ”). And I would read clause (ii) as imposing a receipt of prior services limit on any exceptions to that general rule when school officials fall short of providing a *254 FAPE. See § 1412(a)(10)(C)(ii) (“Reimbursement for private school placement ...”).
This reading can claim the virtue of avoiding a further anomaly. Section 1412(a)(10)(C)(iii), which limits otherwise available reimbursement, is expressly directed to “[t]he cost of reimbursement described in clause (ii).” This makes perfect sense under my reading. Since clause (ii) is now the exclusive source of authority, to order reimbursement, it is natural to refer to it in the clause setting out the conditions for reducing or even denying reimbursement otherwise authorized. Yet, as T. A. and the Government concede, Brief for Respondent 22; Brief for United States as Amicus Curiae 4, 17, under the majority’s reading, Congress has called for reducing reimbursement only for the most deserving (parents described in clause (ii) who consult with the school district and give public special education services a try before demanding payment for private education), but provided no mechanism to reduce reimbursement to the least deserving (parents who have not given public placement a chance).
The Court responds to this point by doubling down. According to the majority, the criteria listed in clause (iii) can justify a reduction not only of “reimbursement described in clause (ii),” § 1412(a)(10)(C)(iii), but can also do so for a reimbursement order authorized elsewhere as well, ante, at 242, n. 8. That is, the majority avoids ascribing perverse motives to Congress by concluding that in both clause (ii) and clause (iii), Congress meant to add nothing to the statutory scheme. This simply leads back to the question of why Congress in § 1412(a)(10)(C) would have been so concerned with cases in which children had not previously received special education services when, on the majority’s reading, the prior receipt of services has no relevance whatsoever to the subject of that provision.
Because any other interpretation would render clause (ii) pointless and clause (iii) either pointless or perverse, § 1412(a)(10)(C)(ii) must be read to allow reimbursement only *255 for “parents of a child with a disability, who previously received special education and related services under the authority of a public agency.”
II
Neither the majority’s clear statement rule nor its policy considerations prevail over the better view of the 1997 amendments.
A
The majority says that, because of our previous interpretation of the Act as authorizing reimbursement for unilateral private placement, Congress was obliged to speak with added clarity to alter the statute as so understood. Ante, at 239-244. The majority refers to two distinct principles for support: first, statutes are to be read with a presumption against implied repeals, e. g., ante, at 243-244 (citing Branch v. Smith, 538 U. S. 254, 273 (2003) (plurality opinion)), and second, congressional reenactment of statutory text without change is deemed to ratify a prior judicial interpretation of it, e. g., ante, at 239-240 (citing Lorillard v. Pons, 434 U. S. 575, 580 (1978)). I think neither principle is up to the task.
Section 1412(a)(10)(C) in no way repealed the provision we considered in Burlington.[3] The relief that “is appropriate” under § 1415(i)(2)(C)(iii) depends on the substantive provisions of the IDEA as surely as if the provision authorized equitable relief “consistent with the provisions of this statute.” [4] When we applied § 1415(i)(2)(C)(iii) in Burlington, *256 we expressly referred to those provisions and concluded that, in the absence of a specific rule, “appropriate” relief included the reimbursement sought. By introducing new restrictions on reimbursement, the 1997 amendments produce a different conclusion about what relief is “appropriate.” But § 1415(i)(2)(C)(iii) remains in effect, just as it would remain in effect if Congress had explicitly amended the IDEA to prohibit reimbursement absent prior receipt of services.
As for the rule that reenactment incorporates prior interpretation, the Court’s reliance on it to preserve Burlington’s reading of § 1415(i)(2)(C)(iii) faces two hurdles. First, so far as I can tell, this maxim has never been used to impose a clear statement rule. If Congress does not suggest otherwise, reenacted statutory language retains its old meaning; but when a new enactment includes language undermining the prior reading, there is no presumption favoring the old, and the only course open is simply to read the revised statute as a whole. This is so because there is no reason to distinguish between amendments that occur in a single clause (as if Congress had placed all the changes in § 1415(i)(2)(C)(iii)), and those that take the form of a separate section (here, § 1412(a)(10)(C)). If Congress had added a caveat within § 1415(i)(2)(C)(iii), or in an immediately neighboring provision, I assume the majority would not approach it with skepticism on the ground that it purported to modify a prior judicial interpretation.
Second, nothing in my reading of § 1412(a)(10)(C)(ii) is inconsistent with the holdings of Burlington and the other prior decision on the subject, Florence County School Dish Four v. Carter, 510 U. S. 7 (1993). Our opinion in Burlington was expressly premised on there being no “other reference” that would govern reimbursement for private tuition, 471 U. S., at 369, and this all but invited Congress to provide one. Congress’s provision of such a reference in 1997 is, to *257 say the very least, no reason for skepticism that Congress wished to alter the law on reimbursement. The 1997 legislation, read my way, would not, however, alter the result in either Burlington or Carter. In each case, the school district had agreed that the child was disabled, the parents had cooperated with the district and tried out an IEP, and the only question was whether parents who later resorted to a private school could be reimbursed “ 'if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act.’” Carter, supra, at 12 (quoting Burlington, supra, at 369). In ordering reimbursement, the Court in both Burlington and Carter emphasized that the parents took part in devising an IEP, 471 U. S., at 368; 510 U. S., at 12, and expressed concern for parents who had sought an IEP before placing their child in private school, but received one that was inadequate, 471 U. S., at 370; 510 U. S., at 12. The result in each case would have been the same under my reading of the amended Act, both sets of parents being “parents of a child with a disability, who previously received special education and related services under the authority of a public agency.” § 1412(a)(10)(C)(ii). It is therefore too much to suggest that my reading of § 1412(a)(10)(C)(ii) would “abrogat[e] sub silentio our decisions in Burlington and Carter,” ante, at 243.
The majority argues that the policy concerns vindicated in Burlington and Carter justify reading those cases to authorize a reimbursement authority going beyond their facts, ante, at 238-239, and would hold reimbursement possible even for parents who, like those here, unilaterally resort to a private school without first establishing at the administrative or appellate level that the child is disabled, or engaging in a collaborative process with the school officials. But how broadly one should read Burlington and Carter is beside the point, Congress having explicitly addressed the subject with statutory language that precludes the Court’s result today.
*258 B
The Court also rejects the natural sense of § 1412(a)(10)(C) as an interpretation that would be “at odds with the general remedial purpose underlying IDEA and the 1997 Amendments.” Ante, at 244. The majority thinks my reading would place the school authorities in total control of parents’ eligibility for reimbursement: just refuse any request for special education or services in the public school, and the prior service condition for eligibility under clause (ii) can never be satisfied. Thus, as the majority puts it, it would “borde[r] on the irrational” to “immuniz[e] a school district’s refusal to find a child eligible for special-education services no matter how compelling the child’s need.” Ante, at 245. I agree that any such scheme would be pretty absurd, but there is no absurdity here. The majority’s suggestion overlooks the terms of the IDEA process, the substantial procedures protecting a child’s substantive rights under the IDEA, and the significant costs of its rule.
To start with the costs, special education can be immensely expensive, amounting to tens of billions of dollars annually and as much as 20% of public schools’ general operating budgets. See Brief for Council of the Great City Schools as Amicus Curiae 22-23. The more private placement there is, the higher the special education bill, a fact that lends urgency to the IDEA’S mandate of a collaborative process in which an IEP is “developed jointly by a school official qualified in special education, the child’s teacher, the parents or guardian, and, where appropriate, the child.” Burlington, supra, at 368.
The Act’s repeated emphasis on the need for cooperative joint action by school and parent does not, however, leave the school in control if officials should wish to block effective (and expensive) action for the child’s benefit, for if the collaborative approach breaks down, the IDEA provides for quick review in a “due process hearing” of the parents’ claim that more services are needed to provide a FAPE than the school *259 is willing to give. See § 1415(c)(2) (district must respond to due process hearing complaint within 10 days and hearing officer must assess facial validity of complaint within 5 days); § 1415(e) (mediation is available, provided it does not delay due process hearing); § 1415(f)(1)(B) (district must convene a meeting with parents within 15 days to attempt to resolve complaint); 34 CFR §§ 300.510(b)(l)-(2) (2008) (if complaint is not resolved, a hearing must be held within 30 days of complaint and a decision must be issued within 75 days of complaint). Parents who remain dissatisfied after these first two levels of process may have a right of appeal to the state educational agency and in any case may bring a court action in federal district court. See 20 U. S. C. § 1415(i)(2). This scheme of administrative and judicial review is the answer to the Court’s claim that reading the prior services condition as restrictive, not illustrative, immunizes a school district’s intransigence, giving it an effective veto on reimbursement for private placement.[5]
That said, the Court of course has a fair point that the prior services condition qualifies the remedial objective of the statute, and pursuing appeals to get a satisfactory IEP with special services worth accepting could be discouraging. The child who needs help does not stop needing it, or stop growing, while schools and parents argue back and forth. *260 But we have to decide this case on the premise that most such arguments will be carried on in good faith, and even on the assumption that disagreements about the adequacy of IEPs will impose some burdens on the Act’s intended beneficiaries, there is still a persuasive reason for Congress to have written the statute to mandate just what my interpretation requires. Given the burden of private school placement, it makes good sense to require parents to try to devise a satisfactory alternative within the public schools, by taking part in the collaborative process of developing an IEP that is the “modus operandi” of the IDEA. Burlington, 471 U. S., at 368. And if some time, and some educational opportunity, is lost in consequence, this only shows what we have realized before, that no policy is ever pursued to the ultimate, single-minded limit, and that “[t]he IDEA obviously does not seek to promote [its] goals at the expense of all considerations, including fiscal considerations,” Arlington Central School Dist. Bd. of Ed. v. Murphy, 548 U. S. 291, 303 (2006).[6]

 Likewise, no one is unsure whether this Court’s Rule 18.6, which states, “Within 30 days after the case is placed on this Court’s docket, the appellee may file a motion to dismiss,...” allows for a motion to dismiss after 30 days. See also Carlisle v. United States, 517 U. S. 416, 431-432 (1996) (listing numerous examples of permissive statements, such as then Federal Rule of Criminal Procedure 17(d)’s statement that a subpoena “may be served” by a person “who is not less than 18 years of age,” that plainly carry a restrictive meaning).

 The majority says that “clause (ii) is best read as elaborating on the general rule that courts may order reimbursement when a school district fails to provide a FAPE by listing factors that may affect a reimbursement award in the common situation in which a school district has provided a child with some special-education services and the child’s parents believe those services are inadequate.” Ante, at 242. But this is just another way of reading the provision off the books. On the majority’s reading, clause (ii) states only that a court may award reimbursement when (1) there is a previous receipt of special education services and (2) a failure to provide a FAPE. Such a description of the most common subset of a category already described may be called elaboration, but it still has no effect on the statutory scheme.

 The presumption against implied repeals would not justify reading the later provision as useless even if it applied since, when two provisions are irreconcilable, the presumption against implied repeals gives way to the later enactment. See Branch v. Smith, 538 U. S. 254, 273 (2003) (plurality opinion).

 No one, for example, would suggest that a court could grant reimbursement under § 1415(i)(2)(C)(iii) to parents of a nondisabled child, but this is obvious only because we assume § 1415(i)(2)(C)(iii) is to be read in light of the substantive provisions of the statute.

 The majority argues that we already rejected this process as inadequate in School Comm. of Burlington v. Department of Ed. of Mass., 471 U. S. 359 (1985). Ante, at 245. That was before the enactment of § 1412(a)(10)(C)(ii). The question in Burlington was whether the reimbursement there was an “appropriate” remedy under § 1415(i)(2)(C)(iii). See 471 U. S., at 370. With no statement to the contrary from Congress, the Court expressed concern over the possible length of the IDEA review process and surmised that Congress would have intended for reimbursement to be authorized. Ibid. But Congress provided a statement to the contrary in 1997; the only reading that gives effect to § 1412(a)(10)(C)(ii) is that reimbursement is not permitted absent prior placement, and the only question for the Court now is whether Congress could have meant what it said.

 See 143 Cong. Rec. 8013 (1997) (statement of Rep. Castle) (“This law . . . has had unintended and costly consequences. ... It has resulted in school districts unnecessarily paying expensive private school tuition for children. It has resulted in cases where lawyers have gamed the system to the detriment of schools and children.” “This bill makes it harder for parents to unilaterally place a child in elite private schools at public taxpayer expense, lowering costs to local school districts”).